IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CRAIG PRICE, II, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:21-cv-03683 |
| | § | |
| VALVOLINE, LLC | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT VALVOLINE LLC'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

Defendant Valvoline, LLC (the "Company," "Valvoline," or "Defendant") files this Motion for Summary Judgment and Brief In Support, and would show:

**I. SUMMARY OF ARGUMENT**

As should go without saying, an employee's failure to show up for work is a legitimate reason for firing him. *See Bell v. Dallas Cty.*, 432 F. App'x 330, 334 (5th Cir. 2011) (per curiam). Despite repeated attempts to correct Plaintiff Craig Price's ("Plaintiff") attendance, he failed to improve. Plaintiff was advised multiple times–through documented corrective action–that if his attendance did not improve, he would be subject to further discipline, including termination of employment. After being placed on a Final Written Warning, Plaintiff called in on October 26, 2020, and indicated that he would not appear for his shift. Accordingly, and in line with Valvoline's attendance policy, Plaintiff's employment was terminated.

During all relevant times to this suit, the Company maintained an attendance policy. The attendance policy required that for certain absences, employees would earn various attendance points. If an employee received a certain amount of attendance points, they would be subject to the Company's progressive discipline policy.

1

Plaintiff had significant attendance issues through most of his employment. On December 30, 2019, Plaintiff was issued a Verbal Warning for his attendance issues.[1] The Verbal Warning detailed the 10 attendance points that Plaintiff had received to-date. Plaintiff continued to have attendance issues, and on February 10, 2020, Plaintiff was issued a Written Warning because he had two instances of being late to work following his Verbal Warning.[2] On May 4, 2020, Plaintiff was issued a Final Written Warning for additional attendance issues. Plaintiff signed the Final Written Warning which stated, "Craig is receiving a final written warning and 3-day suspension for his continues [sic] attendance issues. Additional incidents can lead to further disciplinary action up to and including termination."[3]

On October 26, 2020, Plaintiff reported that he had attended a family wedding and contracted food poisoning. As such, he informed his manager that he was going to miss work. Because he failed to give sufficient notice of his absence, he was issued another attendance point. Plaintiff was already on a Final Written Warning, and thus, the latest point made him eligible for termination pursuant to the clear terms of the attendance policy.

Plaintiff claims that he was subject to discrimination, retaliation and a hostile work environment; however Plaintiff's lawsuit borders on frivolity. During his deposition, Plaintiff answered some version of "don't recall" **more than 200 times** not only to questions that form the basis of his lawsuit, but to even the most mundane issues. Indeed, Plaintiff testified as follows to the <u>central</u> question of his lawsuit:

> Q. Well, you know, you realize that in this lawsuit you're claiming that you were subject to race discrimination, right?
> A. I don't recall, sir.
> Q. What do you believe your lawsuit is about?

---

[1] Exhibit A, Plf. Depo, 33:22-34:25.
[2] *Id.*, 37:21-38:25.
[3] *Id.*, 51:10-16.

> A.      I don't understand the question, sir.
> Q.      **What have you sued Valvoline for?**
> A.      **I don't recall it at the moment, sir.**

Clearly, if Plaintiff cannot recall his own allegations against the Company, Plaintiff cannot meet his burden. While Plaintiff claims he was subject to discrimination and a hostile work environment, he answered that he recalled nothing regarding key facts, such as: (1) Receiving a write up in December 2019 regarding attendance; (2) Receiving a write up in February 2020 regarding attendance; (3) Whether the attendance points were accurately reflected; and (4) Witnesses to alleged comments.[4]

And while Plaintiff now wants to assert that he was subjected to a hostile work environment that was so intolerable, he did not dispute that after his termination of employment, he reached back out to Valvoline asking for his job back.[5]

For the reasons set forth herein, Plaintiff's claims should be dismissed in their entirety.

## II. FACTUAL BACKGROUND

**A.**    **La Porte Plant Management And Supervisors**

When Plaintiff was hired as a loader/unloader at Valvoline's La Porte Plant, the Plant Manager was Jerry Precise.[6] Subsequently, Frank Harris became the Plant Manager in February 2020.[7] During most of the relevant time, Plaintiff reported to Jeffrey Brown (African American) or Dalan Motz (two or more races).[8] Mr. Brown and Mr. Motz reported to Mr. Harris.[9] Mr. Harris

---

[4] *Id.*, 33:22-34:25; 37:21-38:25; 52:14-19; 47:7-13.
[5] *Id.* at 91:17-24.
[6] Exhibit B, Declaration of Frank Harris ("Harris Decl."), ¶3.
[7] *Id.*
[8] *Id.*
[9] *Id.*

3

reported to Rob Shelton.[10] The La Porte plant's human resources point of contact was Kevin Meyers.[11]

**B.      Valvoline's Attendance Policy**

During Plaintiff's employment, Valvoline maintained an attendance policy.[12] *See* Exhibit C. Employees' attendance records are assessed on a rolling 12-month basis. Various attendance points were issued for attendance-related issues. For example, if the employee missed their shift, one (1) point would be assessed.[13]  If the employee was late or left their shift before completing at least half of the shift, one-half (1/2) of a point was assessed.  Employees were advised on the Company's progressive discipline regarding attendance and were informed that upon obtaining five instances/points within a twelve-month period, they would be issued a verbal warning.  At six instances/points, an employee would be issued a Written Warning.  At seven instances/points, they were suspended for three days and issued a Final Written Warning. And finally, at eight instances/points, they employee was advised that their employment would be terminated.[14]

In late 2019, the Company realized that it was not issuing discipline based on certain point thresholds described above.  Several employees had incurred numerous attendance points, but had not been advised of their status and the various steps of the progressive discipline policy had not been implemented.[15] Accordingly, in late 2019/early 2020, there was a restart that was applied universally to all employees.  While attendance points did not immediately go away, regardless of the number of points incurred by the employee, employees would start with a verbal warning.[16]

---

[10] *Id.*
[11] *Id.*
[12] *Id.* at ¶ 4
[13] *Id.*
[14] *Id*.
[15] *Id.* at ¶ 5
[16] *Id.*

For each subsequent attendance point, the Company would proceed to the next level of discipline, as outlined above. In other words, while the attendance policy dictated that employees who had eight (8) attendance points were subject to termination of employment, if the various steps of the progressive discipline had not been documented, the first discipline would be a verbal warning, regardless of the number of points incurred up to that point.[17]

Plaintiff does not dispute that Valvoline had a well-publicized attendance policy; in fact he called the policy "pretty straightforward."[18] Plaintiff concedes he knew the Company's policy.[19] Plaintiff also admits he was advised that an employee would be subjected to various levels of discipline based on the number of incurred attendance points within the last twelve (12) months.[20] Plaintiff admits he knew after receiving a certain threshold of points, he could be terminated.[21]

**C.**     <u>**Valvoline's COVID-19 Policies**</u>

Like many companies, after the onset of the COVID-19, Valvoline's policies evolved during much of 2020. However, the Company clearly communicated that employees who believed they were experiencing symptoms of COVID-19 should not come to work.[22] Employees were not issued attendance points if they reported that they were experiencing COVID-19 symptoms.[23] However, employees that reported other sicknesses unrelated to COVID, would continue to be issued attendance points in line with the attendance policy.[24]

---

[17] *Id.*
[18] Exhibit A, Plf. Depo., 30:16-20.
[19] *Id.*, 28:13-29:22.
[20] *Id.*
[21] *Id.*, 72:6-11.
[22] Exhibit B, Harris Decl., ¶ 6
[23] *Id.*
[24] *Id.*

In April 2020, Plaintiff first reported that his significant other had contracted COVID, and then that he had a possible exposure to COVID.[25] He was given paid time off while he quarantined.[26] Plaintiff earned no attendance points for his COVID-related absences.[27]

**D.    Plaintiff Was Disciplined Numerous Times**

Plaintiff was disciplined numerous times for his attendance issues, and his multiple infractions of the attendance policy.

### 1.    Plaintiff Receives A Verbal Warning in December 2019

On December 30, 2019, Valvoline issued Plaintiff a Written Warning regarding his attendance.[28]  *See* Exhibit D.  The Verbal Warning detailed 10 attendance points that had been issued since October 18, 2019 to December 27, 2019.  Under the plain terms of the attendance policy, Plaintiff's employment should have been terminated after accumulating 8 attendance points.  However, because Plaintiff had not been disciplined for the attendance points before then, he was issued a Verbal Warning, the first level in the progressive discipline policy, as discussed above.  Plaintiff signed and acknowledged the Verbal Warning which stated that, "I understand that failure to meet the expectations outlined above and sustain an acceptable level of performance moving forward may result in further disciplinary action, up to and including termination." *Id*.

Despite this, Plaintiff testified that he recalls nothing about receiving the December 2019 Verbal Warning, or how he received the document.[29]  He testified he did not recall believing anything was inaccurate about the December 2019 Verbal Warning.[30]

---

[25] Exhibit A, Plf. Depo., 49:6-11.
[26] *Id*., 49:12-15.
[27] Exhibit B, Harris Decl., ¶ 7
[28] *Id.*, at ¶ 9.
[29] Exhibit A, Plf. Depo., 34:20-25.
[30] Exhibit A, Plf. Depo., 36:9-11.

### 2. Plaintiff Receives A Written Warning in February 2020

On February 10, 2020, Plaintiff was issued the next level of discipline–a Written Warning–for additional attendance issues. Exhibit E. Specifically on January 21 and February 4, 2020, Plaintiff incurred two additional ½ points for being late. He signed the Written Warning, which also stated, "[i]f there is an accumulation of 1 full incident the next level of escalation will be a 3-day un-paid suspension." *Id.*[31] During his deposition, Plaintiff had nothing to dispute he was late on the dates in the Written Warning.[32]

### 3. Plaintiff Receives A Final Written Warning in May 2020 Regarding His Absences

On May 4, 2020, Plaintiff was issued a Final Written Warning regarding his attendance. Exhibit F. Specifically, on April 28, 2020, Plaintiff earned another attendance point for calling in sick without providing the adequate notice period. At the time the Final Written Warning was issued, Plaintiff had 14.5 attendance incidents/points. *Id.* Plaintiff testified that he had no reason to believe that the number was inaccurate.[33] Plaintiff signed the Final Written Warning which stated, "Craig is receiving a final written warning and 3-day suspension for his continues [sic] attendance issues. Additional incidents can lead to further disciplinary action up to and including termination."[34] *Id.*

---

[31] On February 10, 2020, Plaintiff also received a Verbal Warning for having another colleague edit his time entries. Because this was a performance-based discipline instead of attendance-related, he began discipline at the Verbal Warning level.
[32] Exhibit A, Plf. Depo., 38:19-21. Additionally, Plaintiff testified that he could not recall anything that would refresh his recollection. *Id.*, 38:22-25.
[33] Exhibit A, Plf. Depo., 51:24-52:1; 52:17-19.
[34] *Id.*, 51:10-16.

### 4. In May and June 2020, Plaintiff Received Other Discipline Concerning His Performance

On May 27, 2020, Plaintiff received a Written Warning about his performance. Exhibit G. Specifically, he did not have his radio with him when he was called, and his failure to carry the radio violated prior instructions he had been given, and the Company's safety guidelines.

On June 2, 2020, Plaintiff was issued a Final Written Warning for additional performance issues. Exhibit H. Specifically, he was disciplined for wearing earbuds in the warehouse, which violated company policy, and Plaintiff was also seen violating his work restrictions after a recent workers' compensation injury. And finally, he was also disciplined for the insubordinate and disrespectful behavior he exhibited towards his supervisor, Jeffrey Brown. As part of the Final Written Warning, he received a 3-day suspension. Plaintiff was told that "[a]dditional incidents can lead to further discipline action up to and including termination of your employment." *Id*. Despite the fact that the Final Written Warning was issued by Mr. Brown, who is African American, Plaintiff testified that he believed the warning was given to him because of his race.[35]

### E. Plaintiff Was Terminated For Additional Attendance Issues

On October 26, 2020, Plaintiff called Mr. Harris and reported that he had attended a wedding over the weekend, and believed that he food poisoning.[36] Plaintiff does not deny making such a comment to Mr. Harris.[37] However, Plaintiff never indicated that he was experiencing COVID-19 symptoms or had otherwise been exposed to COVID-19.[38] While Plaintiff claims he went to a physician for whatever ailment/illness he was experiencing, Plaintiff concedes that he

---

[35] Exhibit A, Plf. Depo., 60:10-18.
[36] Exhibit B, Harris Decl., ¶ 14.
[37] Exhibit A, Plf. Depo., 64:7-9.
[38] Exhibit B, Harris Decl., ¶ 14.

8

never provided a doctor's note to the Company.[39] Moreover, when asked if Plaintiff in fact had COVID, unsurprisingly Plaintiff testified as follows:

> Q: Did you test for COVID after the wedding?
> A: I don't recall it at the moment, sir.
> Q: Have you ever tested positive for COVID?
> A: I don't remember at this moment, sir.
> Q: You don't know if you've ever tested positive for COVID?
> A: I don't remember at this moment, sir.[40]

Plaintiff produced no evidence that he even was tested for COVID after the wedding.[41]

Consistent with the Company's attendance policy, because Plaintiff did not report he was experiencing COVID-related symptoms, Plaintiff was issued another attendance point for his reported food poisoning-related absence.[42] Plaintiff was eligible for termination of his employment, and the Company terminated his employment.[43] *See* Exhibit I.

Mr. Harris recommended that his employment be terminated, which was supported by his supervisor (Mr. Shelton) and human resources (Kevin Meyers).[44] None of the other managers at the La Porte facility (Mr. Brown or Mr. Motz) were consulted on the decision to terminate.[45]

### F. Plaintiff's Unfounded Claims

As part of his claims, Plaintiff alleges various incidents he believes supports his claims for race discrimination, retaliation, and/or a hostile work environment, such as: (1) Plaintiff alleges that his former supervisor, Jamie Langston, called him a "lazy boy;"[46] (2) Plaintiff claims that

---

[39] Exhibit A, Plf. Depo., 64:17-22. To date, Plaintiff has not provided any record or evidence of his doctor's visit.
[40] *Id.*, 65:2-8.
[41] Exhibit B, Harris Decl., ¶ 15.
[42] *Id.*, ¶ 16.
[43] *Id.*
[44] *Id.*, ¶17.
[45] *Id.*
[46] Exhibit A, Plf. Depo. 45:17-19.

twice Mr. Langston "followed me from one point to the next point in front of a room of people;"[47] (3) Plaintiff claims that a material handler (not anyone with supervisory responsibility over Plaintiff) told him "that basically what Jamie Langston says goes and that this isn't a democracy, this is a dictatorship;"[48] (4) That Mr. Motz on one occasion remarked to Plaintiff, "you people always want something for free;"[49] and finally (5) Plaintiff also claims he called the Company's hotline to make a complaint, but can recall no specifics:

> Q: …Do you recall ever calling the HR hot line?
> A: Yes, sir.
> Q: How many times did you call the HR hot line?
> A: I don't recall at this moment, sir.
> Q: Was it more than once?
> A: I don't recall at this moment, sir.
> Q: Was it more than ten times?
> A: I don't recall at this moment, sir.
> Q: So it could have been more than a hundred times that you called the HR hot line?
> A: I don't recall at this moment.
> ***
> Q: Do you recall talking to anyone at HR about the way that you believe that you're being treated?
> A: I don't recall it at this moment, sir.
> ***
> Q: And I just want to be really clear, Mr. Price, sitting here today under other [sic] you cannot tell us anything about the one time that you can recall [calling HR]; is that right?
> A: Yes, sir. I don't remember how many times I called.
> Q: And again, sir, my question is not how many times. You've testified that you called at least once, right?
> A: Yes, sir.
> Q: And I'm asking you, Mr. Price, do you recall anything of the substance of that conversation?
> A: I don't recall at the moment, sir.
> Q: Is there anything that you would look at or could look at that would refresh your memory of what you discussed on the one time that you can recall?

---

[47] *Id.*, 45:25-46:4
[48] *Id.*, 47:23-48:4.
[49] *Id.*, 48:11-23.

10

    A:    I don't recall it at the moment, sir.[50]

Besides these sporadic, unrelated, and unsupported incidents, Plaintiff recalls no other specifics to cement his allegations against Defendant.

### III. ARGUMENTS AND AUTHORITIES

**A.**    **Summary Judgment Standard**

To overcome Valvoline's motion for summary judgment, Plaintiff must raise a genuine issue of material fact whether Valvoline discriminated against him based on his race. *See* FED. R. CIV. P. 56(c). Unlawful discrimination under Title VII can be established through either direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (citing *Urbano v. Cont'l Airlines, Inc.,* 138 F.3d 204, 206 (5th Cir. 1999)). Plaintiff has set forth no direct evidence of disparate treatment, his claim is analyzed using the test in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001). Under this test, a plaintiff must initially establish a prima facie case of race discrimination, which raises a presumption of discrimination. *Id*.; see also *Rutherford v. Harris County*, 197 F.3d 173, 179-80 (5th Cir. 1999). If successful, the burden then shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for its actions. *Okoye*, 245 F.3d at 512. The burden on the defendant at this stage "is one of production, not persuasion . . . [and] can involve no credibility assessment." *Rios v. Rossotti*, 252 F.3d 375, 379 (5th Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000)). If the defendant sustains its burden, "the presumption of discrimination dissipates." *Wallace*, 271 F.3d at 220 (citing *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000)). The burden then "shifts back to the plaintiff to establish: (1) that the employer's proffered reason is not true[,] but

---

[50] *Id*., 61:4-63:5.

is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (citing *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)). "The plaintiff bears the ultimate burden of persuading the trier of fact . . . that the employer intentionally discriminated against [him] because of [his] protected status." *Wallace*, 271 F.3d at 220 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

### B.     Plaintiff's Race Discrimination Claim Fails

Plaintiff's discrimination claim fails as he cannot establish that he was treated differently than other similarly-situated employees. Plaintiff's claim also fails because he cannot overcome Valvoline's legitimate, non-discriminatory reason for his termination of employment.

To establish a prima facie case of race discrimination, Plaintiff must show "that he: (1) is a member of a protected class, (2) was qualified for [his] position, (3) was subject to an adverse employment action, and (4) . . . 'that others similarly situated [but outside the protected class] were treated more favorably.'" *Okoye*, 245 F.3d at 512-13 (quoting *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir. 1999)); *see also Alvarado*, 492 F.3d at 611. Alternatively, in a work rule-violation case, such as this, "a Title VII plaintiff may establish a prima facie case [of discrimination] by showing 'either that he did not violate the rule or that, if he did, [employees outside his protected class] who engaged in similar acts were not punished similarly.'" *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995) (quoting *Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980)). Plaintiff has failed to establish his case under either approach.

### 1. Plaintiff Cannot Establish A Prima Facie Case of Discrimination

Applying the four-pronged test for establishing a prima facie case of race discrimination, Valvoline does not dispute that Plaintiff is African-American, is a member of a protected class, was qualified, or suffered an adverse employment action when his employment was terminated. However, Plaintiff cannot establish the fourth element of his prima facie case.

To establish the fourth element of a prima facie case of race discrimination under Title VII, a plaintiff may present "circumstantial evidence that [he] has been treated differently than similarly situated non-members of the protected class." *Williams v. Trader Pub. Co.*, 218 F.3d 481, 484 (5th Cir. 2000) (citing *Polanco v. City of Austin*, 78 F.3d 968, 977 (5th Cir. 1996)). To satisfy the "similarly situated" requirement, the circumstances of the plaintiff and the non-protected class member must be more than similar, they must be "nearly identical." *Perez v. Tex. Dept. of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004). Thus, Plaintiff must demonstrate "that the misconduct for which [he] was discharged was nearly identical to that engaged in by a [Caucasian] employee whom the company retained." *Smith v. Wal-Mart Stores*, 891 F.2d 1177, 1180 (5th Cir. 1990) (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir. 1982)). The "alleged comparator employees [must have been] similarly situated from the perspective of their employer at the time of the relevant employment decision []," *Perez*, 395 F.3d at 209, and the comparator employees' position in organization--e.g., job title, duties, supervisor--should be roughly the same. *See, e.g., Wyvill v. United Cos. Life Ins. Co.,* 212 F.3d 296, 305 (5th Cir. 2007); *see also Ramirez v. Gonzales*, 225 F. App'x 203, 207-08 (5th Cir. 2005); *Little v. Republic Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991).

Plaintiff concedes that he has no insight or visibility to his coworkers' absences.[51] Plaintiff simply has a subjective belief about his alleged comparators. For instance, he believes that former coworker Dennis Jannise was treated better than him under the points system, but he admits that he did not know how many points Mr. Jannise had.[52]

### 2. Valvoline Had a Legitimate, Nondiscriminatory Reason For Terminating Plaintiff's Employment

Even if Plaintiff is deemed to have successfully established his prima facie case (which he cannot), he cannot overcome Valvoline's legitimate, non-discriminatory reason for its decision to terminate him, that Valvoline had a reasonable, good faith belief that Plaintiff failed to abide COVID-related absence policy. *See Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1298 (5th Cir. 1981) ("[A] mistaken but good-faith belief that an employee has violated the employer's rule is sufficient to rebut the *McDonnell Douglas* inference that the employee was discharged for impermissible reasons."); *see Mayberry*, 55 F.3d at 1090-91 (violations of an employer's "Code of Conduct" legitimate grounds for termination); *see also Davis v. Moore Wallace, Inc.*, 217 F. App'x 313 (5th Cir. 2007), aff'g No. 9:05-CV-57, 2006 U.S. Dist. LEXIS 15652 (E.D. Tex. March 15, 2006) (failure to abide by employer's attendance policy legitimate grounds for plaintiff's termination); *Mascorro v. Am. Funds Serv. Co.*, No. SA-05-CA-590-FB, 2006 U.S. Dist. LEXIS 94024 (W.D. Tex. Nov. 20, 2006) (same); *Jordon v. Tex. Dep't of Aging & Disabilities Servs.*, No. 9:05CV161, 2006 U.S. Dist. LEXIS 43895 (E.D. Tex. June 28, 2006) (same); *Thomas v. Willis G's Post Oak, Inc.,* No. H-04-4479, 2006 U.S. Dist. LEXIS 29906 (S.D. Tex. April 25, 2006) (same).

---

[51] Exhibit A, Plf. Depo., 72:23-73:3.
[52] *Id.*, 74:5-17; 75:21-23.

Plaintiff's employment was terminated when he reported he could not come to work because he had food poisoning from a wedding. Plaintiff never reported he believed he had COVID or that he had symptoms of COVID. Plaintiff had been counseled numerous times about his absences and he was warned that if he obtained additional attendance points, his employment was in jeopardy.

Numerous courts have found that violation of an attendance policy to be a legitimate, nonretaliatory reason for discharging an employee. *See, e.g., Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F. Supp. 2d 849, 865 (S.D. Tex. 2007) (citing *Davis v. Moore Wallace, Inc.*, 217 F. App'x 313, 316 (5th Cir. 2007)). As a general proposition, an employer's termination of an employee for violation of a neutral attendance policy is legitimate. *Roberts v. Mega Life & Health Ins. Co.*, No. Civ. A. 304CV756M, 2005 U.S. Dist. LEXIS 4388 (N. D. Tex., March 22, 2005); *See also Troupe v. Cintas*, No. Civ.A.3:99CV0193M, 2000 U.S. Dist. LEXIS 10710, 2000 WL 1056327, at *3 (N. D. Tex. July 31, 2000); *Powers v. Woodlands Religious Cmty. Inc.*, 323 F. App'x 300, 302 (5th Cir. 2009) (per curiam) ("[The employer's] stated reason for [the employee's] termination—absenteeism—is a legitimate nondiscriminatory reason for its decision."); *Hypes ex rel. Hypes v. First Commerce Corp.*, 134 F.3d 721, 726 (5th Cir. 1998) (per curiam) (recognizing a record of excessive absences is a legitimate, nondiscriminatory reason to fire an employee).

### 3. **Plaintiff Cannot Overcome Valvoline's Legitimate, Nondiscriminatory Reason For His Termination of Employment**

Once a defendant establishes a legitimate, nondiscriminatory reason for the adverse employment action, the "presumption of discrimination created by the prima facie case disappears, and the plaintiff is left with the ultimate burden of proving discrimination." *Sandstad v. CB Richards Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511-12 (1993)). A plaintiff must provide substantial evidence to raise a genuine issue of

fact regarding pretext. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219-20 (5th Cir. 2001). A plaintiff must do so by either showing that the defendant's nondiscriminatory explanations are "false or 'unworthy of credence,'" or by presenting evidence of disparate treatment. *Hernandez v. Clearwater Transp., Ltd.*, 550 F. Supp. 3d 405, 417 (W.D. Tex. 2021) (quoting *Wallace*, 271 F.3d at 220); *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 826 (5th Cir. 2022).

However, "employment laws do not transform federal courts into human resources managers, so the inquiry is not whether [the employer] made a wise or even correct decision to terminate [the plaintiff]." *Owens*, 33 F.4th at 826 (citing *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005)). "The ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Id.* (quoting *Crawford v. Formosa Plastics Corp., La.,* 234 F.3d 899, 902 (5th Cir. 2000)).

To evaluate a claim of pretext, "a court should consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case.'" *Crawford*, 234 F.3d at 902. Ultimately, "evidence must be of sufficient 'nature, extent, and quality' to permit a jury to reasonably infer discrimination." *Owens*, 33 F.4th at 826. Even when such a showing is made, however, it is not always enough to prevent summary judgment if "'no rational factfinder could conclude that the action was discriminatory.'" *Lockhart v. Republic Servs., Inc.*, No. 20-50474, 2021 WL 4955241, at *3 (5th Cir. Oct. 25, 2021).

Plaintiff will likely argue that he believed he was complying with the COVID-related attendance policies, and therefore, he did not violate the policy. However, the undisputed evidence is that Plaintiff reported that he had food poisoning, not anything related to COVID. Plaintiff's

disagreement with Valvoline's assessment of his actions does not create a fact issue for trial. *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002). Because Plaintiff has failed to offer evidence he was treated differently than employees outside of his protected group and, instead, merely asserts that defendant's stated reasons for his discharge are false or unworthy of credence, Plaintiff must offer evidence that (1) rebuts the non-discriminatory reason articulated by Valvoline, and (2) shows that the real reasons were discriminatory animus for his race or color. *See Wallace,* 777 F. App'x at 89 (citing *Laxton*, 333 F.3d at 578). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men [or women] in the exercise of impartial judgment might reach different conclusions." *Id.* (citing *Laxton*, 333 F.3d at 579).

Plaintiff has no evidence to support pretext. He has no evidence that his termination was due to his race or in retaliation for any protected activity (*See* Infra, Section III. C)

**C.** **Plaintiff's Retaliation Claim Also Fails.**

Plaintiff claims that his employment was terminated after he engaged in protected activity. According to Plaintiff, he reported an alleged comment by Dalan Motz "to Jeffrey Brown, a supervisor, and to the Valvoline hotline." [Doc. No. 12, ¶ 29].

To establish a prima facie case of retaliation, a plaintiff must show that: (1) he participated in an activity protected under Title VII; (2) his employer took an adverse employment action against him; and (3) a causal link exists between the protected activity and the adverse action. *Feist v. Louisiana*, 730 F.3d 450, 454 (5th Cir. 2013). The causal connection must be "but for," meaning that the adverse action would not have occurred without the protected activity. *Univ. of Tex. SW Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013). If Plaintiff can make this showing, the burden shifts as above to the employer to articulate a legitimate, non-discriminatory reason for its decision and then to the plaintiff to show this reason is actually a pretext retaliation. *Septimus v. Univ. of Houston*, 399 F.3d 601, 610-11 (5th Cir. 2005).

17

Even if Plaintiff engaged in protected activity, he cannot establish that a causal link exists between his purported protected activity and his termination of employment. Assuming for the purposes of this Motion that Plaintiff reported the comments to supervisor Jeff Brown, he still cannot establish a causal connection. Mr. Brown was not involved in the decision to terminate Plaintiff's employment. To establish the causal link, "the evidence must show that the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Sherrod v. Am. Airlines*, 132 F.3d 1112, 1122 (5th Cir. 1998). A plaintiff must allege facts showing that the decisionmaker knew the protected activity; otherwise, there can be no causal connection between the protected activity and any adverse employment action taken by that decisionmaker. *Watts v. Kroger Co.*, 170 F.3d 505, 512 (5th Cir. 1999); see also *Corley v. Jackson Police Dep't*, 639 F.2d 1296, 1300 (5th Cir. 1981).

Because Plaintiff cannot establish a prima facie case, his retaliation claims should be dismissed.

> **1. Plaintiff Cannot Overcome Valvoline's Legitimate, Nonretaliatory Reason For Terminating His Employment**

Even if Plaintiff can establish the prima facie elements of his retaliation claim, Valvoline terminated Plaintiff's employment for legitimate, non-retaliatory reasons, and thus his claim fails. *See supra*, Section III. C. For the same reasons articulated above, Plaintiff has no evidence of pretext, and his retaliation claim should be dismissed in its entirety.

**D.** **Plaintiff's Hostile Work Environment Claim Fails**

Like his other claims, Plaintiff's hostile work environment claims fail. Plaintiff alleges two comments were made to him, and which support his hostile work environment claim–that Motz said "You people always want something" and that Langston called him a "lazy boy." [Doc. No. 12, ¶37]. Even if these comments were true (which Valvoline denies), they simply cannot establish

an actionable hostile work environment claim. To establish a hostile work environment claim, Plaintiff must demonstrate that:

> (1) the employee belonged to a protected class; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment was based on race; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 298 (5th Cir. 2001).

For conduct to be sufficiently severe or pervasive, it must be both objectively and subjectively offensive. *Badgerow v. REJ Properties, Inc*., 974 F.3d 610, 617-18 (5th Cir. 2020). To determine whether the work environment is objectively offensive, the court should consider the totality of the circumstances, including "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id*. at 618 (internal quotation marks omitted). "No single factor is determinative." *Id*. (internal quotation marks omitted). Simple teasing, rude or offensive comments, or isolated incidents will not amount to actionable discrimination. *Harris*, 510 U.S. at 21; *Hockman v. Westward Commc'ns, L.L.C.,* 407 F.3d 317, 326, 122 Fed. Appx. 734 (5th Cir. 2004).

The "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Carder v. Cont'l Airlines, Inc*., 636 F.3d 172, 177 (5th Cir. 2011) (emphasis in original). "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998). The standards for judging hostility are "demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the

workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id*. (citations omitted).

Plaintiff has simply not met his burden to establish a hostile work environment. At most, Plaintiff's alleged allegations of hostile work environment claims constitute mere "petty slights, minor annoyances, and simple lack of good manners." *See Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 485 (5th Cir. 2008) (quoting *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 60, 67 (2006)); *see also Dailey v. Shintech, Inc.*, 629 F. App'x 638, 640, 644 (5th Cir. 2015) (plaintiff failed to establish a hostile work environment even though his supervisor called him "a 'black little motherf—r' on at least two occasions" and the supervisor said "he would 'kick his black a—s'").

### IV. CONCLUSION

For the reasons set forth herein, Defendant Valvoline LLC requests that the Court grant its Motion for Summary Judgment and dismiss Plaintiff's claims in their entirety.

Dated November 14, 2022

Respectfully submitted,

/s/ *Jeremy W. Hawpe*
Jeremy W. Hawpe
State Bar No. 24046041
jhawpe@littler.com
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Lock Box 116, Dallas, Texas 75201
214.880.8100 Phone; 214.880.0181 Fax
ATTORNEY FOR DEFENDANT

### CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of November, 2022, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Southern District of Texas, Houston Division, using the electronic case filing system of the court.

/s/ *Jeremy W. Hawpe*
Jeremy W. Hawpe