# EXHIBIT A

Craig Price, II  *  August 29, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CRAIG PRICE, II,               )
                               )
     PLAINTIFF,                )
                               )
VS.                            ) CIVIL ACTION NO.:
                               ) 4:21-CV-03683
VALVOLINE, LLC,                )
                               )
     DEFENDANT.                )

_____

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF
CRAIG PRICE, II
AUGUST 29, 2022
_____

REMOTE ORAL AND VIDEOTAPED DEPOSITION OF CRAIG

PRICE, II, produced as a witness at the instance of the

DEFENDANT, and duly sworn, was taken in the above-styled

and numbered cause on the 29th of August, 2022 from

10:02 a.m. to 1:06 p.m., before Stefanie Andrews, CSR in

and for the State of Texas, reported remotely by machine

shorthand, pursuant to the Federal Rules of Civil

Procedure.

Craig Price, II   *   August 29, 2022

---

Page 2

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3       Mr. Lewis Zipkin
         Mr. Kevin M. Gross
 4       ZIPKIN WHITING CO., L.P.A.
         The Zipkin Whiting Building
 5       3637 South Green Road
         Beachwood, Ohio 44122
 6       Phone: (216) 514-6400
         E-mail: Zfwlpa@gmail.com
 7       E-mail: Kgross.zipkinwhiting@gmail.com
 8   FOR THE DEFENDANT:
 9       Mr. Jeremy W. Hawpe
         LITTLER MENDELSON, P.C.
10       2001 Ross Avenue
         Suite 1500
11       Dallas, Texas 75201
         Phone: (214) 880-8100
12       E-mail: Jhawpe@littler.com
13       And
14       Ms. Urvashi Morolia
         LITTLER MENDELSON, P.C.
15       1301 McKinney Street
         Suite 1900
16       Houston, Texas 77010
         Phone: (713) 951-9400
17       E-mail: Umorolia@littler.com
18   ALSO PRESENT:
         Brian Primavera, Videographer
19
20
21
22
23
24
25
```

---

Page 3

```
 1                   INDEX
 2                                    PAGE
 3   Appearances                        2
 4   CRAIG PRICE, II
         Examination by Mr. Hawpe       4
 5
 6   Signature and Changes            102
 7   Reporter's Certificate           103
 8                 EXHIBITS
 9   NO.        DESCRIPTION      PAGE IDENTIFIED
10   Exhibit 1   7/23/19 Performance Action Notice    30
11   Exhibit 2   12/30/2019 Performance Action Notice 33
12   Exhibit 3   2/10/20 Performance Action Notice    37
                 Written
13
     Exhibit 4   2/10/20 Performance Action Notice    39
14               Verbal
15   Exhibit 5   5/1/20 Final Written Warning        50
16   Exhibit 6   5/27/20 Performance Action Notice   52
17   Exhibit 7   6/2/20 Final Written Warning        53
18   Exhibit 8   11/13/20 Sahli E-mail              68
19   Exhibit 9   Statement of Valvoline             94
20
21
22
23
24
25
```

---

Page 4

```
 1              P R O C E E D I N G S
 2       (Oath administered remotely by the court
 3   reporter located in McKinney, Texas, to the witness
 4   located in Houston, Texas.)
 5       THE VIDEOGRAPHER:  We are on the record
 6   at 10:02.  Today is Monday, August 29th, 2022.  This is
 7   the video deposition of Craig Price, II, in the matter
 8   of Craig Price, II verse Valvoline, LLC.  This is filed
 9   in the United States District Court for the Southern
10   District of Texas, Houston Division, Civil Action No.
11   4:21-CV-03683.  These proceedings are being held
12   remotely, and will counsel please state their
13   appearances and any agreements for the record.
14       MR. HAWPE:  Hi there.  This is Jeremy
15   Hawpe on behalf of the defendant.  I'm also joined here
16   with Urva Morolia from Littler as well.
17       MR. GROSS:  And Kevin Gross on behalf of
18   Mr. Price along with Lew Zipkin.
19       THE VIDEOGRAPHER:  Will the court
20   reporter please swear in the witness.
21              CRAIG PRICE, II,
22   having been first duly sworn, testified as follows:
23              EXAMINATION
24   BY MR. HAWPE:
25       Q.  Mr. Price, we didn't get to meet, but I'm
```

---

Page 5

```
 1   Jeremy Hawpe.  I represent Valvoline in this lawsuit.
 2   You understand that you're here to give your deposition
 3   testimony in the lawsuit that you brought against
 4   Valvoline?
 5       A.  How you doing?  Yes, sir, I do understand.
 6       Q.  Great.  Mr. Price, could you state your full
 7   name for the record, please?
 8       A.  Craig Bernard Price, II.
 9       Q.  And, Mr. Price, I know you told the court
10   reporter that you're currently in Houston.  Are you at
11   your -- your home in Houston?
12       A.  Yes.
13       Q.  And where do you currently live?  What's the
14   address?
15       A.  9300, Humble, Texas 77396.
16       Q.  You gave 9300.  Is that in Humble?
17       A.  Yes, North -- North Sam Houston Beltway, yes,
18   sir.
19       Q.  Gotcha, perfect.  And how long have you lived
20   at that address?
21       A.  Maybe about two months.
22       Q.  Prior to that address where did you live?
23       A.  I don't recall the address at this moment.
24       Q.  Was it in Houston?
25       A.  It was in Humble, Texas.
```

Craig Price, II   *   August 29, 2022

Page 6

1      Q.   And how long did you approximately live at
2    that address?
3      A.   I don't recall at this exact moment.
4      Q.   Have you -- have you moved a bunch in the last
5    couple of years?
6      A.   No, sir.
7      Q.   Mr. Price, do you have a cell phone number?
8      A.   I do.
9      Q.   What is that number?
10     A.   (832) 488-0179.
11     Q.   And who is your cell phone provider?
12     A.   T-Mobile.
13     Q.   And one of the things that we'll be talking
14   about today, Mr. Price, happened in 2019 and 2020.  Did
15   you have the same cell phone number back in 2019 and
16   2020?
17     A.   Yes.
18     Q.   And did you still have T-Mobile in 2019 and
19   2020?
20     A.   Yes.
21     Q.   Mr. Price, have you ever given your deposition
22   testimony before?
23     A.   No, sir.
24     Q.   Let me just go over just a few rules that I
25   think will make the morning go by faster.  First, you

Page 7

1    understand that you're under oath just as if you were in
2    a courtroom in front of a judge and jury?
3      A.   Yes, sir.
4      Q.   You're doing a great job, Mr. Price, thus far.
5    Even on Zoom, we can see each other, but it's difficult
6    for court reporters to get down head nods and uh-huhs
7    and huh-uhs.  So if you'll continue to answer verbally,
8    the court reporter will certainly appreciate that.
9    Okay?
10     A.   Yes, sir.
11     Q.   If at any time you don't understand a question
12   that I've asked you, please stop me and I'll do my best
13   to rephrase.  Okay?
14     A.   Yes, sir.
15     Q.   You're also doing a great job of this.  It's
16   difficult for the court reporter to get us both talking
17   at the same -- at the same time.  So if you'll allow me
18   to finish my question before you start your answer,
19   I'll, in turn, allow you to finish your answer before I
20   go into my next question.  Okay?
21     A.   Yes, sir.
22     Q.   Is there any reason, Mr. Price, that you are
23   not able to testify truthfully today?
24     A.   No, sir.
25     Q.   Are you taking any medications that would

Page 8

1    affect your memory?
2      A.   No, sir.
3      Q.   Are you taking any medications today at all?
4      A.   No, sir.
5      Q.   I don't expect, Mr. Price, that this
6    deposition will go super long.  It's not an endurance
7    contest.  So if at any point you need a break, just stop
8    and we'll do our best to take a break.  The only thing
9    I'll ask of you is to answer the question that's pending
10   before we take that break.  Okay?
11     A.   Yes, sir.
12     Q.   And -- and finally, Mr. Price, there may be
13   times where I ask you personal questions.  I just want
14   to assure you that it's not because I'm trying to be
15   nosy or be overly invasive, but it's because I think
16   that it's relevant to the claims in this lawsuit.  So I
17   just wanted to alert you of that on the front end.
18   Okay?
19     A.   Yes, sir.
20     Q.   Other than your attorney, and I certainly
21   don't want to hear about any conversations with your
22   attorney, did you meet with anyone to prepare for
23   today's deposition?
24     A.   No, sir.
25     Q.   Did you review any documents that refreshed

Page 9

1    your memory of any of the allegations that you've made
2    in this lawsuit?
3      A.   No, sir.
4      Q.   Have you kept in contact with any of your
5    former coworkers that you worked with at Valvoline since
6    you left in October of 2020?
7      A.   Yes, sir.
8      Q.   Who have you kept in contact with?
9      A.   Jeffery Brown, Michael Preston, Dezra Thomas,
10   Chadrick Chavez, and Romales Townsend.
11     Q.   What was that first name on Townsend?
12     A.   Romales.
13     Q.   So with Mr. Brown, Jeffery Brown, he was one
14   of your former supervisors; is that correct?
15     A.   Yes, sir, he was.
16     Q.   And when is the last time that you talked to
17   Mr. Brown?
18     A.   I don't recall at the moment.
19     Q.   Is he someone that you've consistently kept in
20   contact with since October of 2020 or just on one or two
21   occasions?
22     A.   I don't recall at the moment.
23     Q.   Have you talked to him more than once?
24     A.   I don't recall at the moment.
25     Q.   What's the ways that you have communicated

3  (Pages 6 to 9)

Craig Price, II   *   August 29, 2022

Page 10

1    with Mr. Brown, have you talked to him over the phone?
2         A.   Yes.
3         Q.   Have you exchanged text messages with him?
4         A.   Yes.
5         Q.   Have you exchanged e-mails with him?
6         A.   No, sir.
7         Q.   Are there any other ways that possibly you've
8    communicated with Mr. Brown?
9         A.   No, sir.
10        Q.   Have you asked him to be a witness for you to
11   in this lawsuit?
12        A.   No, sir.
13        Q.   Michael Preston, who is Mr. Preston?
14        A.   A former coworker.
15        Q.   Was he essentially at your same level within
16   the organization?
17        A.   Yes.
18        Q.   And when is the last time you talked to
19   Mr. Preston?
20        A.   I don't recall at the moment, sir.
21        Q.   How many times have you talked to Mr. Preston
22   since October of 2020?
23        A.   I don't recall at the moment.
24        Q.   Have you communicated with him over the phone?
25        A.   Yes.

Page 11

1         Q.   Have you communicated with him via text?
2         A.   Yes, sir.
3         Q.   Have you communicated with him via e-mail?
4         A.   No, sir.
5         Q.   Have you asked Mr. Preston to be a witness for
6    you in this lawsuit?
7         A.   Yes, sir.
8         Q.   And -- okay.  I'll come back to him in just a
9    second.  I believe you said Desiree Thomas; is that
10   right?  Am I pronouncing the first name right?
11        A.   Dezra.
12        Q.   That's a female?
13        A.   A male.
14        Q.   Male.  And who is Mr. Thomas?
15        A.   Former coworker.
16        Q.   And again, was he at the same level as you
17   within Valvoline, as far as you're aware?
18        A.   Yes.
19        Q.   And when is the last time you talked to
20   Mr. Thomas?
21        A.   I don't recall.
22        Q.   Have you talked to Mr. Thomas over the phone?
23        A.   Yes.
24        Q.   Have you talked to Mr. Thomas via text
25   messages?

Page 12

1         A.   Yes.
2         Q.   Have you asked Mr. Thomas to be a witness for
3    you in this lawsuit?
4         A.   I don't recall.
5         Q.   Chadrick Chavez, who is Mr. Chavez?
6         A.   A former coworker.
7         Q.   And again, to the best of your knowledge,
8    Mr. Price, was he at the same level as you within
9    Valvoline?
10        A.   Yes.
11        Q.   And when is the last time you talked to
12   Mr. Chavez?
13        A.   I don't recall at the moment, sir.
14        Q.   And have you communicated with Mr. Chavez via
15   phone?
16        A.   Yes, sir.
17        Q.   Have you communicated with him via text?
18        A.   Yes, sir.
19        Q.   Have you asked Mr. Chavez to be a witness in
20   this lawsuit?
21        A.   Yes, sir.
22        Q.   And then Mr. Townsend, Mr. Townsend is -- was
23   he also a coworker of yours?
24        A.   Yes, sir.
25        Q.   And was he, to the best of your knowledge, the

Page 13

1    same level as you?
2         A.   Yes, sir.
3         Q.   And when is the last time you talked to
4    Mr. Townsend?
5         A.   I don't recall at the moment.
6         Q.   And have you communicated with Mr. Townsend
7    via the telephone?
8         A.   Yes, sir.
9         Q.   Have you exchanged text messages with him?
10        A.   Yes, sir.
11        Q.   Have you asked him to be a witness for you in
12   this lawsuit?
13        A.   No, sir.
14        Q.   You said that you asked Mr. Chavez and
15   Mr. Thomas to be witnesses for you.  Are there any other
16   individuals that you've reached out to ask if they
17   would be a witness for you in this lawsuit?
18        A.   No, sir.
19        Q.   Just a little bit of background, Mr. Price,
20   could you tell us your date of birth?
21        A.   May 10th, 1987.
22        Q.   Mr. Price, are you currently married?
23        A.   Yes.
24        Q.   And how long have you been married?
25        A.   I don't recall at the moment.

4 (Pages 10 to 13)

Craig Price, II   *   August 29, 2022

Page 14

1    Q.   More than five years?
2    A.   No, sir.
3    Q.   And what is your wife's name?
4    A.   Kendra Paris.
5    Q.   Do you have any children?
6    A.   No, sir.
7    Q.   Your wife, does she work outside of the home?
8    A.   Yes, sir.
9    Q.   And what does she do?
10   A.   Law enforcement.
11   Q.   And when you say, law enforcement, does she
12   work for a local police department?
13   A.   Yes.
14   Q.   What police department does she work for?
15   A.   The Metropolitan Police Department.
16   Q.   And she had that job when you worked at
17   Valvoline; is that correct?
18   A.   Yes.
19   Q.   I assume that your wife lives with you; is
20   that right?
21   A.   Yes.
22   Q.   Is there anyone that lives with you besides
23   your wife?
24   A.   No, sir.
25   Q.   Mr. Price, have you ever been arrested?

Page 15

1    A.   Yes.
2    Q.   How many times have you been arrested?
3    A.   Once.
4    Q.   And what -- what was -- what were you arrested
5    for?
6    A.   Failure to appear in court.
7    Q.   And approximately how long ago was that?
8    A.   I don't recall.
9    Q.   Was it last year?
10   A.   I don't recall at the moment.
11   Q.   You don't know if you were arrested last year?
12   A.   I don't recall at the moment, sir.
13   Q.   Do you have any documents in your possession
14   that would refresh your memory?
15   A.   No, sir.
16   Q.   Did you serve any time as part of this?
17   A.   Could you ask me another way.
18   Q.   Yeah.
19   A.   Ask me the question in another way, please.
20   Q.   Yeah.  Did you serve any jail time as part of
21   the arrest?
22   A.   Yes.
23   Q.   How long did you serve?
24   A.   I don't recall at this moment.
25   Q.   You don't recall how long you were in jail?

Page 16

1          MR. ZIPKIN:  Objection.
2          MR. GROSS:  Objection.
3          MR. HAWPE:  Okay.  Who's defending the
4    depo because I got two people it seemed like?  Is it
5    Mr. Gross or Lew?
6          MR. GROSS:  I haven't made an objection.
7    That was Lew.
8          MR. HAWPE:  Got it.  Just your box lit up
9    as well.  He must be near you.
10   Q.   Mr. Price, you don't recall how long you were
11   in jail?
12   A.   No, sir, I don't, not at this moment.
13   Q.   Was it more than a day?
14   A.   I don't recall at this moment, sir.
15   Q.   Was it more than a week?
16   A.   I don't recall at this moment, sir.
17   Q.   Was it more than a month?
18         MR. ZIPKIN:  Objection.
19   A.   Was it more than a month?
20   A.   I don't recall at this moment.
21   Q.   Did you pay any fine as part of this arrest?
22   A.   I don't recall at this moment, sir.
23   Q.   Have you ever been convicted of any crimes?
24   A.   No, sir.
25   Q.   Have you ever been a party to any other

Page 17

1    lawsuit?
2    A.   No, sir.
3    Q.   A little bit more background.  Mr. Price, did
4    you graduate from high school?
5    A.   Yes, sir, I did.
6    Q.   Where did you graduate from?
7    A.   Forest Brook High School.
8    Q.   What year was that?
9    A.   2005.
10   Q.   After high school, did you attend any colleges
11   or universities?
12   A.   No, sir.
13   Q.   Tell me a little bit about your -- and I
14   certainly, Mr. Price, don't need to know every job that
15   you held between 2005 and 2019, but when you come out of
16   high school, what was the first job that you had?
17   A.   I worked at a day care.
18   Q.   What did you do for the day care?
19   A.   A teacher and a helper.
20   Q.   What was the name of that day care?
21   A.   I don't recall at the moment.
22   Q.   After you were at the day care, what's the
23   next job that you recall having?
24   A.   Aircraft cleaner.
25   Q.   And who was your employer then?

5 (Pages 14 to 17)

Craig Price, II   *   August 29, 2022

Page 18

1    A.  World Services.
2    Q.  And how long did you work at World Services?
3    A.  I don't recall.
4    Q.  What is the next job that you had after World
5  Services?
6    A.  Triple-S Steel.
7    Q.  What did you do for Triple-S Steel?
8    A.  Loader, unloader.
9    Q.  How long were you at Triple-S?
10   A.  I don't recall at this moment.
11   Q.  What was the next job after Triple-S Steel
12  that you had?
13   A.  North Shore Steel.
14   Q.  What did you do at -- for North Shore Steel?
15   A.  Loader, unloader.
16   Q.  How long were you employed by North Shore?
17   A.  I don't recall at the moment, sir.
18   Q.  What was the next job after North Shore Steel?
19   A.  Valvoline.
20   Q.  And your title at Valvoline was a loader,
21  unloader; is that right?
22   A.  Yes, sir.
23   Q.  Of the jobs that you held prior to Valvoline,
24  Mr. Price, were you ever fired from any of those jobs?
25   A.  Yes, sir.

Page 19

1    Q.  Which jobs were you fired from?
2    A.  Triple-S Steel.
3    Q.  Any other places that you were fired from?
4    A.  North Shore.
5    Q.  Any other places?
6    A.  No, sir.
7    Q.  For Triple-S Steel, what was the reason they
8  told you that they were -- they were firing you?
9    A.  I don't recall at the moment, sir.
10   Q.  With North Shore Steel, what was the reason
11  that they told you they were firing you?
12   A.  I don't recall it at the moment, sir.
13   Q.  Focusing on after Valvoline, just so that
14  we're on the same page, I show that your employment
15  ended at the end of October of 2020.  Do you agree with
16  that?
17   A.  Yes, sir.
18   Q.  Since 2020 have you been employed by any other
19  company?
20   A.  Yes, sir.
21   Q.  What was the first company that you worked for
22  after Valvoline?
23   A.  North Shore Steel.
24   Q.  Have you worked for any other company other
25  than North Shore Steel after October of 2020?

Page 20

1    A.  Yes, sir, I have.
2    Q.  And what other companies have you worked for?
3    A.  FlexSteel, MRC Global, DB Schenker, and that's
4  all that I remember at the moment, sir.
5    Q.  What about Three L Fuel, did you work for
6  them?
7    A.  Yes, sir.
8    Q.  And Plateplus, did you work for them?
9    A.  Yes, sir.
10   Q.  And Brenntag, did you work for them?
11   A.  Yes, sir.
12   Q.  Since October of 2020, have you been fired
13  from any of the jobs that you've held since October
14  of 2020?
15   A.  I don't recall it at the moment, sir.
16   Q.  Well, you said the first job that you held was
17  North Shore Steel.  Why did your employment end from
18  North Shore Steel the second time?
19   A.  I don't recall at the moment, sir.
20   Q.  Did you voluntarily leave?
21   A.  I don't recall at the moment, sir.
22   Q.  Why did your employment at Flex Steel end?
23   A.  I don't recall at the moment, sir.
24   Q.  Why did your employment at Brenntag end?
25   A.  I don't recall at the moment, sir.

Page 21

1    Q.  Why did your employment at DB Schenker end?
2    A.  That was a temp service.
3    Q.  Meaning that DB was the temp provider that
4  then loaned you out to another company; is that right?
5    A.  I don't understand the way that you worded it,
6  sir.
7    Q.  Well, you said that it was a temp service,
8  meaning that DB was the temp service?
9    A.  No, sir.
10   Q.  Well, we'll come back to that.  Three L Fuel,
11  why did your employment at Three L Fuel end?
12   A.  A layoff, sir.
13   Q.  Plateplus, why did your employment at
14  Plateplus end?
15   A.  The company was closing.
16   Q.  MRC Global, why did your employment with MRC
17  Global end?
18   A.  I don't recall, sir, at this moment.
19   Q.  Sitting here today, who is your current
20  employer?
21   A.  Unemployed at the moment.
22   Q.  And what was the -- what was the last job you
23  had prior -- your most recent job, in other words?
24   A.  O'Neal Manufacturing.
25   Q.  What did you do for them?

6  (Pages 18 to 21)

Craig Price, II   *   August 29, 2022

Page 22

1   A.  Loader, unloader.
2   Q.  And how long have you been unemployed for?
3   A.  I don't recall at the moment, sir.
4   Q.  I mean, are you taking unemployment benefits?
5   A.  No, sir.
6   Q.  And you said that you don't recall how long
7   you've been unemployed.  I mean, have you been out of
8   work for more than a week?
9   A.  I don't recall at the moment, sir.
10   Q.  Do you not know if you -- I guess I'm
11   confused, Mr. Price.  Did you work last week?
12   A.  I don't recall at the moment, sir.
13   Q.  Prior to O'Neal Manufacturing, who did you
14   work for?
15   A.  Plateplus.
16   Q.  I'm sorry, could you say that again?
17   A.  Plateplus.
18   Q.  You said that that job ended because the
19   company was closing?
20   A.  Yes, sir.
21   Q.  About how long did you work for O'Neal
22   Manufacturing?
23   A.  I don't recall at this moment, sir.
24   Q.  Do you know if it was more than a month?
25   A.  I don't recall at this moment, sir.

Page 23

1   Q.  Well, since your employment ended at O'Neal
2   Manufacturing, have you applied at other places?
3   A.  Yes, sir, I have.
4   Q.  When is the last application that you -- you
5   made?
6   A.  I don't recall it at the moment, sir.
7   Q.  Did you apply to any places last week?
8   A.  I don't recall at the moment, sir.
9   Q.  What was the last place that you applied to?
10   A.  I don't recall it at the moment, sir.
11   Q.  The place that you -- you said that you've
12   applied for jobs.  Did you apply online or in person?
13   A.  Online, sir.
14   Q.  And applying online, do you use one of these,
15   like, job boards like Monster or things like that or are
16   you applying directly with companies?
17   A.  Like Monster, yes.
18   Q.  You said that you're not receiving
19   unemployment benefits, have you applied for them?
20   A.  No, sir.
21   Q.  Why not?
22   A.  I'm not into that.
23   Q.  When you say you're not into that, what do you
24   mean?
25   A.  I prefer to work.

Page 24

1   Q.  All of the -- well, to just kind of go back
2   here just for a second.  O'Neal Manufacturing, were you
3   working full-time for them?
4   A.  Yes, sir.
5   Q.  Who -- and let me just ask you, and we can go
6   through all of these, Mr. Price, if it's easier, but of
7   all the places that you've mentioned, we talked about
8   North Shore, Three L, Plateplus, et cetera, were those
9   all full-time jobs or were there some in that that were
10   part-time?
11   A.  No, sir.  They all full-time.
12   Q.  And just so that you and I are on the same
13   page, when we talk about full-time, we're talking about
14   at least 40 hours a week?
15   A.  Yes, sir.
16   Q.  Were there any places that you worked at since
17   Valvoline where you were working more than 40 hours a
18   week on a pretty regular basis?
19   A.  Yes, sir.
20   Q.  What places were you working more than 40
21   hours in a week?
22   A.  I don't recall it at the moment, sir.
23   Q.  As far as your compensation, I get that there
24   may be some varying here, but generally were you making
25   about the same amount at all these places that you've

Page 25

1   worked at since Valvoline?
2   A.  I don't recall it at the moment, sir.
3   Q.  How much did you make at O'Neal Manufacturing?
4   A.  I don't recall at the moment, sir.
5   Q.  How much did you make at North Shore Steel?
6   A.  I don't recall at the moment, sir.
7   Q.  How much did you make at FlexSteel?
8   A.  I don't recall at the moment, sir.
9   Q.  How much did you make at Plateplus?
10   A.  I don't recall at the moment, sir.
11   Q.  How much did you make at MRC Global?
12   A.  I don't recall at the moment, sir.
13   Q.  How much did you make at Brenntag?
14   A.  I don't recall at the moment, sir.
15   Q.  Do you have medical insurance sitting here
16   today?
17   A.  No, sir.
18   Q.  Does your wife's employer offer medical
19   insurance benefits?
20   A.  I don't recall at the moment, sir.
21   Q.  Have you ever been on your wife's medical
22   insurance?
23   A.  I don't recall at the moment, sir.
24   Q.  You said that you were -- the job prior to
25   Valvoline was North Shore Steel, right?

7 (Pages 22 to 25)

Craig Price, II   *   August 29, 2022

Page 26

1    A. Yes, sir.
2    Q. Do you recall how you found out about the job
3 at Valvoline that you ultimately received?
4    A. Yes, sir, a recruiter reached out.
5    Q. And just so that we're clear, reached out
6 after North Shore had terminated your employment?
7    A. No, sir.
8    Q. So while you were still employed?
9    A. Yes, sir.
10    Q. Who did you interview with as part of the job
11 that you received at Valvoline?
12    A. I don't recall at the moment, sir.
13    Q. And we talked about that your job was a
14 loader, unloader, right?
15    A. Yes, sir.
16    Q. And that's the job that you had the entire
17 time that you were at Valvoline?
18    A. Yes, sir.
19    Q. And when you first started, who did you report
20 to?
21    A. I don't recall at the moment, sir.
22    Q. Well, let's maybe do this a different way.
23 Can you tell me all of the supervisors that you reported
24 to while you were at Valvoline?
25    A. Could you ask me in another way.

Page 27

1    Q. Who were your supervisors at Valvoline?
2    A. I don't recall at the moment, sir.
3    Q. Sitting here today, Mr. Price, you don't know
4 one single supervisor that you reported to?
5    A. Yes.
6    Q. And who do you remember reporting to?
7    A. Jeffery Brown.
8    Q. Anyone else?
9    A. Yes.
10    Q. Who?
11    A. Jarvis Wright, Sr.
12    Q. Anyone else that you remember reporting to?
13    A. Yes.
14    Q. Who else?
15    A. Tamika Price.
16    Q. Anyone else?
17    A. I don't recall it at this moment, sir.
18    Q. So just so that we're on the same page,
19 Mr. Price, could you tell us about what your job duties
20 were as a loader, unloader, just so that we have a
21 better understanding of what your job duties involved?
22    A. Yes, sir. I was to unload trucks, load
23 trucks, stage materials, pull orders, do cycle counting,
24 housekeeping.
25    Q. And were you -- and I know the operations

Page 28

1 were, you know, running multiple shifts. Were you
2 primarily working one particular shift or did your --
3 did the shift change over time for you?
4    A. Yes, sir, they changed over times.
5    Q. And again, just so that we're on the same
6 page, as a loader, unloader, would you -- when you come
7 in for your shift, were you told what to do? I mean, in
8 other words, did a supervisor tell you, Craig, we need
9 you to do one, two or three or was it -- were your job
10 duties assigned to you in another way?
11    A. On different days, there will be different
12 tasks.
13    Q. Now, when you were employed at Valvoline,
14 you're aware that the company had an attendance policy,
15 right?
16    A. Yes.
17    Q. And just -- again, so that you and I are
18 talking the same language here, the attendance policy
19 awarded or issued certain points for certain attendance
20 issues. Would you agree with that?
21    A. Yes, sir.
22    Q. Meaning that if you were tardy, there was a
23 certain point assigned to -- to you or to the employee
24 that was tardy. Is that fair?
25    A. Yes, sir.

Page 29

1    Q. And if -- if an employee left early, there may
2 be a certain point assigned for leaving early. Is that
3 fair?
4    A. Yes, sir.
5    Q. And then finally, there would be certain
6 points assigned if an employee wasn't able to show up
7 for their shift. Is that fair?
8    A. Yes, sir.
9    Q. And as these points are issued to an employee,
10 they -- well, let me just ask you, how long did those
11 points, to the best of your knowledge, stay on the
12 employee's record?
13    A. For a year.
14    Q. And with these attendance points, Mr. Price,
15 you were aware that at certain thresholds, at certain
16 numbers, there were certain discipline issues. Is that
17 fair?
18    A. Yes, sir.
19    Q. Did you ever see a written policy?
20    A. Yes, sir.
21    Q. And how did you see the written policy?
22    A. It was given to me.
23    Q. And was that given to you as part of
24 orientation or was there a meeting? Can you tell me a
25 little bit more about how it was given to you?

8 (Pages 26 to 29)

Craig Price, II  *  August 29, 2022

Page 30

1    A.  Yes, sir, it was prior to a meeting.
2    Q.  And was -- was that towards the beginning of
3  your employment?
4    A.  No, sir.
5    Q.  Who -- who gave you the policy?
6    A.  I don't recall at the moment.
7    Q.  You said it was given to you prior to a
8  meeting?
9    A.  Yes, sir.
10    Q.  And was it given -- to the best of your
11  knowledge, was it given to you individually or to a
12  group of you prior to a meeting?
13    A.  A group of us.
14    Q.  Was the policy also by the time clock?
15    A.  I don't recall at the moment, sir.
16    Q.  When you received the policy that you
17  mentioned receiving, did you have questions about the
18  policy or was it pretty straightforward from your
19  perspective?
20    A.  Pretty straightforward.
21      (Exhibit No. 1 presented.)
22    Q.  I want to show you what -- I will share my
23  screen as Exhibit No. 1.  This is Valvoline
24  Bates-labeled 88.  I'm going to try to show my screen
25  here.  Mr. Price, do you see Exhibit 1 on your screen?

Page 31

1    A.  Yes.
2    Q.  And I can zoom in a little bit.  You need to
3  tell me if you need me to zoom in or scroll and we'll
4  try to work through this together.  But this is --
5  Exhibit No. 1 is a performance action notice dated
6  July 23rd, 2019.  Do you see that?
7    A.  Yes, sir.
8    Q.  And it refers to a supervisor, Jamie Langston.
9  Do you recall a Jamie Langston?
10    A.  Yes, sir.
11    Q.  And was he one of your supervisors?
12    A.  No, sir.
13    Q.  Who was Mr. Langston?
14    A.  The assistant plant manager.
15    Q.  Just so that you and I are on the same page,
16  was there someone in between you and Mr. Langston that
17  you would have directly reported to?
18    A.  I don't recall at the moment, sir.
19    Q.  But your testimony is you never directly
20  reported to Mr. Langston?
21    A.  I don't recall it at the moment, sir.
22    Q.  So do you recall receiving Exhibit No. 1, the
23  performance action notice of July of 2019?
24    A.  Yes, sir.
25    Q.  Who presented this to you?

Page 32

1    A.  Mr. Jerry.
2    Q.  And we see his name on the right-hand side,
3  Jerry Precise, is that who you're referring to?
4    A.  Yes, sir.
5    Q.  And who was Mr. Precise, was he your direct
6  supervisor at any time?
7    A.  No, sir.
8    Q.  And what was his role, to the best of your
9  understanding?
10    A.  Plant manager.
11    Q.  So you said that Mr. Precise presented this to
12  you, was it -- was there anyone else around when this
13  was given to you?
14    A.  I don't recall it at the moment, sir.
15    Q.  What do you recall of that meeting?
16    A.  I remember me being called into the office to
17  receive a writeup for a violation for a -- staging
18  material in the wrong area.
19    Q.  And do you recall anything that Mr. Precise
20  told you there in that meeting?
21    A.  I don't recall at the moment.
22    Q.  And as Exhibit No. 1 says that the incident
23  was placing cargo in the fire lane and double stacking
24  outside the drop ceiling.  Do you see that?
25    A.  Yes, sir, I do.

Page 33

1    Q.  And that's what you're being accused of here.
2  If you scroll down to the bottom, there's a statement.
3  Is that -- is that a statement that you wrote?
4    A.  Yes, sir, it was.
5    Q.  And you -- you say, I went to my material
6  hander and asked him for his permission to place the
7  pallets there and he said, yes, I could.  Who was the
8  material handler that you're referring to?
9    A.  Eric Hawkins.
10    Q.  And so is it fair to say -- I can stop sharing
11  here.  Is it fair to say, Mr. Price, that you disputed
12  getting this -- this verbal warning?
13    A.  No, sir.
14    Q.  Maybe that was a bad question.  You --
15      MR. ZIPKIN:  I'm going to object.
16    Q.  Let me ask it this way.  Did you believe that
17  the -- that the writeup in Exhibit No. 1 was fair?
18    A.  No, sir, I didn't.
19    Q.  Did you believe that it was given to you
20  because of your race?
21    A.  No, sir.
22      (Exhibit No. 2 presented.)
23    Q.  Let's look at Exhibit No. 2.  Share my screen.
24  Exhibit No. 2 is coming up and that is Valvoline 92.  Do
25  you see that on your screen, Mr. Price?

9 (Pages 30 to 33)

Craig Price, II   *   August 29, 2022

Page 34

1    A.  It's kind of hard for me to see, sir.
2    Q.  Yeah, let's -- I'll just kind of go here at
3   the top, hopefully zooming in.  Does that make it a
4   little better?
5    A.  Yes, sir.
6    Q.  And you see here that it says, immediate
7   supervisor Dalan Motz.  Was Mr. Motz ever your direct
8   supervisor?
9    A.  Yes, sir.
10   Q.  And then we see on the right side, Jerry
11  Precise.  He was the plant manager at the time?
12   A.  Yes, sir.
13   Q.  And if you scroll here toward the bottom, is
14  that your signature at the bottom dated 12/13/2019?
15   A.  Yes, sir.
16   Q.  And if we kind of focus here on the center
17  there, is it fair to say that this -- this writeup in
18  Exhibit No. 2 focuses on some attendance points?
19   A.  Yes, sir.
20   Q.  And, Mr. Price, tell me what you recall about
21  receiving Exhibit No. 2.  Who presented this to you?
22   A.  I don't recall it at the moment, sir.
23   Q.  Do you recall anything about how you received
24  Exhibit No. 2?
25   A.  I don't recall it at the moment, sir.

Page 35

1    Q.  Looking at Exhibit No. 2, you see a number of
2   dates there from October to December of 2019.  Do you
3   see that?
4    A.  Yes, I do.
5    Q.  And you see that there are some written --
6   handwritten numbers to the left of those dates.  Do you
7   see that?
8    A.  Yes, sir, I do.
9    Q.  And do you know who wrote those numbers?
10   A.  No, sir.  I don't.
11   Q.  Would you agree, Mr. Price, that these look
12  like point values under the attendance policy?
13   A.  I can't recall, sir, at the moment.
14   Q.  Well, in Exhibit No. 2 there are a number of
15  instances of being tardy or missing.  Let me just ask
16  kind of a broad question, Mr. -- Mr. Price.  Any reason,
17  sitting here today, to dispute the accuracy of the
18  things that are listed in Exhibit No. 2 about being
19  tardy or being absent?
20   A.  I don't understand the question, sir.
21   Q.  Yeah.  So in -- well, let's see if we agree on
22  this.  You agree that Exhibit No. 2 lists some instances
23  where the allegation was that you were tardy or absent.
24  Is that fair?
25   A.  I don't understand, sir.

Page 36

1    Q.  Well, let's go one by one.  October 18, 2019,
2   text message sent to notify me at 11:28 you will not
3   make it to work again on -- on 10/21.
4      Did I read that correctly?
5    A.  Yes, that's on the paper.
6    Q.  And do you know if you worked on 10/21/2019 or
7   not?
8    A.  I don't recall, sir.
9    Q.  Is there anything in Exhibit No. 2, Mr. Price,
10  that you believe is inaccurate?
11   A.  I don't recall, sir.
12   Q.  And you -- again, you signed this in December.
13  Would you agree, Mr. Price, that the numbers here that
14  are handwritten to the -- to the left and there's a sum
15  of ten, you -- sitting here today you don't know if
16  those are point numbers for the attendance policy or
17  not?
18   A.  I don't recall, sir.
19   Q.  And you don't recall any -- anything about the
20  meeting that you may have had to receive Exhibit No. 2?
21   A.  I don't recall, sir.
22   Q.  Meaning you don't know if there were any
23  witnesses; is that right?
24   A.  I don't recall, sir.
25   Q.  Do you believe that you received the writeup

Page 37

1   in Exhibit No. 2 because of your race?
2    A.  I don't recall, sir.
3    Q.  Well, you know, you realize that in this
4   lawsuit you're claiming that you were subject to race
5   discrimination, right?
6    A.  I don't recall, sir.
7    Q.  What do you believe your lawsuit is about?
8    A.  I don't understand the question, sir.
9    Q.  What have you sued Valvoline for?
10   A.  I don't recall it at the moment, sir.
11      MR. HAWPE:  This may be a great time for
12  our first break.
13      MR. GROSS:  All right.  When do you want
14  to come back?
15      MR. HAWPE:  Just like five minutes.
16      THE VIDEOGRAPHER:  Off the record at
17  10:52.
18      (Recess from 10:52 a.m. to 11:02 a.m.)
19      THE VIDEOGRAPHER:  We are back on the
20  record at 11:02.
21      (Exhibit No. 3 presented.)
22   Q.  (BY MR. HAWPE)  Okay, Mr. Price, I want to
23  show you what I've marked as Exhibit No. 3.  This is
24  Valvoline 91.  Should be coming up here shortly.  I can
25  zoom in to make it a little bit better.  Do you see the

10 (Pages 34 to 37)

Craig Price, II  *  August 29, 2022

Page 38

1  top portion of Exhibit No. 3?
2      A.  Yes, sir.
3      Q.  This is another personnel action form that at
4  the bottom you -- you signed, dated February 10th, 2020.
5  Do you see that?
6      A.  Yes, sir.
7      Q.  And that is your signature at the bottom?
8      A.  Yes, it is.
9      Q.  And this regards two attendance issues, one on
10  January 21st, and the second on February 4th, 2020.  I
11  guess before we get further into that, Mr. Price, do you
12  recall receiving Exhibit No. 3 while you were employed?
13      A.  I don't recall, sir.
14      Q.  Do you recall anything about -- and I know
15  this may be repetitive, but I'm just trying to make
16  sure, do you recall anything about receiving the writeup
17  in Exhibit No. 3?
18      A.  I don't recall, sir.
19      Q.  Do you have any reason to dispute these two --
20  these two dates being late?
21      A.  I don't recall, sir.  Not at this moment.
22      Q.  Well, is there anything that you have that you
23  could look at that would refresh your memory as to
24  whether you were late on those days?
25      A.  No, sir.  I don't recall at this moment.

Page 39

1      Q.  You see here at the bottom that where it says,
2  if there is an accumulation of one full incident, the
3  next level escalation will be a three-day unpaid
4  suspension.  Do you see that?
5      A.  Yes, sir, I do.
6      Q.  And you're aware that when you were an
7  employee that the company had an attendance policy that
8  one of the levels of discipline was an unpaid
9  suspension; is that right?
10      A.  Yes, sir.
11      Q.  I'm going to show you what I've marked as
12  Exhibit No. 4.  And that is Valvoline 90.
13          (Exhibit No. 4 marked.)
14      Q.  Do you see Exhibit No. 4?
15      A.  Yes, sir, I see Exhibit No. 4.
16      Q.  And we'll come back to that middle section in
17  a minute, but is that your signature at the bottom of
18  Exhibit No. 4?
19      A.  Yes, sir, it is.
20      Q.  And this is the same date, February 10th,
21  2020.  Do you recall, Mr. Price, receiving essentially
22  two writeups in a meeting with Mr. Motz?
23      A.  I don't recall it at this moment, sir.
24      Q.  Take a look at the incident description there
25  in the center of Exhibit No. 4 and let me know when

Page 40

1  you've had a chance to review that.
2      A.  Yes, sir.
3      Q.  Mr. Price, have you had a chance to look at
4  that?
5      A.  Yes, sir, I just finished.
6      Q.  Do you recall anything about -- there's a big
7  echo.  I don't know, Kevin, if that's happening on your
8  end, but Lew, are you -- oh.
9          MR. ZIPKIN:  My mute went off.  I
10  apologize.
11          MR. GROSS:  I can move to a --
12          MR. HAWPE:  Okay.  That will probably be
13  better.  Thank you.
14      Q.  Mr. Price, if you look at Exhibit No. 4, and
15  that center section that you just read, do you recall
16  anything about the -- the incident that's described
17  there in Exhibit No. 4?
18      A.  I don't understand, sir.
19      Q.  Well, in Exhibit No. 4, there is the
20  allegation that -- that you asked Veronica to make a
21  time punch edit, right?
22      A.  Yes, sir.
23      Q.  And do you recall anything about asking
24  Veronica to make a time punch edit?
25      A.  Yes, sir, I do.

Page 41

1      Q.  And in this Exhibit it says that -- that
2  second paragraph, second sentence, this was a
3  misrepresentation of facts as you were not there at
4  13:59 and led to a falsification of the time records.
5  Did I read that correctly?
6      A.  Yes, sir, you read that correctly.
7      Q.  Did you believe that the writeup that you were
8  receiving in Exhibit No. 4 was unfair?
9      A.  Yes, I believe it was unfair.
10      Q.  Why was it unfair?
11      A.  Because the time clock didn't work.  It wasn't
12  always working.
13      Q.  Well, in -- in Exhibit No. 4, Mr. Price, the
14  way that it is written is that you indicated that you
15  were going to be late for the shift.  Do you remember
16  seeing that?
17      A.  Yes, sir.
18      Q.  And that your shift started at 1400, which is
19  2 o'clock, right?
20      A.  Yes, sir.
21      Q.  And that you weren't at the -- well, let me
22  ask you, do you recall if you were late to your shift
23  that day?
24      A.  Yes, sir, but I wasn't late for my shift.  I
25  remember that day.

11  (Pages 38 to 41)

Craig Price, II   *   August 29, 2022

Page 42

1    Q. So help me understand, Mr. Price. So you --
2 you texted -- I assume that you were texting Mr. Motz;
3 is that correct?
4    A. Yes, sir.
5    Q. So you texted Mr. Motz that you were going to
6 be late, right?
7    A. Yes, sir, I believed that I was going to be
8 late that day.
9    Q. But you weren't in fact late?
10   A. Correct, sir.
11   Q. And there's a discussion that there was a -- a
12 safety meeting at the beginning of the shift. Do you
13 remember seeing that?
14   A. Yes, sir.
15   Q. And was there typically a safety meeting at
16 the beginning of every shift?
17   A. Yes, sir.
18   Q. And was that something that -- that you were
19 expected to attend every day?
20   A. Yes, sir.
21   Q. And in Exhibit No. 4, Mr. Motz said that you
22 were not present at that -- at that safety meeting at
23 the beginning of the shift. Do you recall seeing that?
24   A. Yes, sir.
25   Q. And is that a true statement that you were not

Page 43

1 present at that -- that shift meeting?
2    A. Correct, sir.
3    Q. And so the -- the idea that you were clocked
4 in or that the time edit was made at 1359, one minute
5 prior to the shift starting, your testimony is that you
6 were actually there at 1359?
7    A. Yes, sir, I was.
8    Q. And so why were you not at the safety meeting
9 that occurred that -- at the beginning of that shift?
10   A. I had to still prepare with my proper
11 equipment on in order to be in the meeting, but I
12 clocked in. I tried to clock in and the time clock
13 wasn't working.
14   Q. And do you recall any of the conversation that
15 you had when you received Exhibit No. 4, this writeup?
16   A. Could you ask me in a different way, sir.
17   Q. Yeah. In other words, did you tell Mr. Motz
18 that you thought that this was an incorrect summary?
19   A. Yes.
20   Q. And what was his response?
21   A. I don't recall at this moment, sir.
22   Q. Do you recall anything else about the meeting
23 that you -- you may have had when you received Exhibit
24 No. 4?
25   A. Yes.

Page 44

1    Q. What else do you recall?
2    A. Just basically argument about the -- not an
3 argument, but basically, you know, about the time clock,
4 and that I actually had made it on time.
5    Q. And do you recall what, if any, response
6 Mr. Motz had?
7    A. I don't recall it at this moment, sir.
8    Q. Did you believe that you were receiving this
9 writeup on February 10th, did you recall -- I'm sorry,
10 let me rephrase this.
11          Did you believe that you were receiving
12 this writeup because of your race?
13   A. Yes.
14   Q. Why do you believe that?
15   A. Because of the turmoil that I already was
16 dealing with at Valvoline.
17   Q. When you say the turmoil, what do you mean?
18   A. Basically the mistreatment that I was
19 receiving.
20   Q. And what was the mistreatment you were
21 receiving when you received Exhibit No. 4?
22   A. In my opinion, working in a hostile
23 environment being an African-American male.
24   Q. What was the hostile environment, can you tell
25 me what you mean by that?

Page 45

1    A. Yes. I basically received different treatment
2 from other races and other employees that I worked with.
3    Q. What kind of different treatment?
4    A. Disrespect and hostility and racism.
5    Q. When you say disrespect, hostility and racism,
6 who are you referring to?
7    A. Prior to that, mainly, Mr. Jamie Langston.
8    Q. Anyone else besides Mr. Langston?
9    A. Yes, sir.
10   Q. Who -- who else?
11   A. Dalan Motz.
12   Q. Anyone else?
13   A. Eric Hawkins.
14   Q. Anyone else?
15   A. Those are the only names that I recall at this
16 time, sir.
17   Q. What did Mr. Langston do to you that
18 constituted disrespect, hostility and racism?
19   A. He called me a lazy boy.
20   Q. Anything else?
21   A. Yes, sir. He actually followed me around the
22 warehouse and kind of taunted me in front of half of the
23 first shift and half of the second shift crew and we had
24 a debate about the word "insubordination."
25   Q. When you say that he taunted you, what do you

12 (Pages 42 to 45)

Craig Price, II   *   August 29, 2022

Page 46

1  mean?
2      A.  On two occasions he basically kind of followed
3  me from one point to the next point in front of a room
4  of people.
5      Q.  And when you say he followed you, like a few
6  steps behind you?
7      A.  I don't understand the question, sir.
8      Q.  Yeah.  When you said he followed you, was he
9  literally like a few steps behind you?
10     A.  I don't recall at this moment.
11     Q.  Well, what do you recall of him following you?
12     A.  I don't recall at this moment, sir.
13     Q.  When you say that he referred to you as a lazy
14 boy, do you recall any context of that statement and how
15 that came up?
16     A.  Could you repeat that question differently,
17 please.
18     Q.  Yeah.  Tell me -- tell me about the
19 conversation you had where he called you a lazy boy.
20     A.  Basically, the shift had just started and I
21 was trying to get a forklift to work and I wasn't able
22 to get one, and he started raising his voice, saying --
23 it escalated and, you know, went from there and he
24 called me a lazy boy.
25     Q.  And what was your response?

Page 47

1      A.  I really was shocked that he said that out
2  loud.
3      Q.  Did you have a response?
4      A.  Yes.
5      Q.  What was your response?
6      A.  I shook my head and I walked off.
7      Q.  Were there any witnesses to this statement?
8      A.  Yes.
9      Q.  Who?
10     A.  I don't recall at the moment, sir.
11     Q.  Is there anything that would refresh your
12 memory as to who witnessed the statement?
13     A.  I don't recall at the moment, sir.
14     Q.  You said that he was following you around, did
15 you ask him why he was following you around?
16     A.  No, sir, I did not.
17     Q.  You said that Eric Hawkins also fell in this
18 category of disrespect, hostility and racism.  What
19 did -- first, Mr. Hawkins was the material handler; is
20 that right?
21     A.  Yes, sir, the lead material handler.
22     Q.  And was he your direct supervisor at any time?
23     A.  No, sir.  He was my lead.
24     Q.  And what, if anything, did Mr. Hawkins do that
25 was disrespectful, showed hostility or racism?

Page 48

1      A.  Yes, sir.  On that same particular day, Eric
2  Hawkins told me that basically what Jamie Langston says
3  goes and that this isn't a democracy, this is a
4  dictatorship.
5      Q.  Any other incidents with Mr. Hawkins that you
6  believe were disrespectful or showed hostility?
7      A.  I don't recall at the moment, sir.
8      Q.  You also mentioned Dalan Motz in this.  What
9  did Mr. Motz do that showed hostility or racism to you?
10     A.  I don't understand the question, sir.
11     Q.  Yeah.  When I asked you who -- you said that
12 you -- that the environment was disrespectful, hostility
13 and racism.  I asked you to identify who treated you
14 that way and you listed Mr. Motz.  So my question is,
15 what did Mr. Motz do that showed you hostility and
16 racism?
17     A.  Yes, sir.  I was supposed to receive some
18 T-shirts as an incentive bonus for something, and I
19 stopped -- and I stopped Mr. Motz one day to ask him
20 about the shirts and his reply was, you people always
21 want something for free, and that hurt, you know.  He
22 said, you know, what he said, and I didn't particularly
23 feel comfortable with that comment.
24     Q.  Were there any witnesses to that comment?
25     A.  I don't recall at this moment, sir.

Page 49

1      Q.  What was your response to the comment?
2      A.  Again, I just looked at him and was surprised
3  that he said it out loud.
4      Q.  Did you have any response?
5      A.  No, sir.  I didn't.
6      Q.  Kind of picking back up on the timeline,
7  Mr. Price.  We just looked at Exhibit No. 4, which was
8  in February of 2020.  We all know that COVID hit in
9  March of 2020.  At the beginning of April of 2020, you
10 had a possible exposure to COVID; is that right?
11     A.  That's correct.
12     Q.  And the company gave you time off for that?
13     A.  Yes, sir.
14     Q.  And that was paid time off?
15     A.  Yes, sir.
16     Q.  Now, at some point -- and you tell me if I've
17 gotten this wrong, Mr. Price, I'm not sure about the
18 timeline.  There was also somewhere around here where
19 your wife had been hit in the head with a brick; is that
20 right?
21     A.  I don't recall, sir.
22     Q.  Your wife has never been hit with a brick?
23     A.  I don't recall it at this moment, sir.
24     Q.  Has your wife ever been injured in the line of
25 duty?

13 (Pages 46 to 49)

Craig Price, II   *   August 29, 2022

Page 50

1      A.  I don't recall it at this moment, sir.
2      Q.  Well, would you disagree that for almost the
3  entire month of April of 2020 you were off work from
4  Valvoline; is that right?
5      A.  I don't recall at the moment, sir.
6      Q.  Do you recall ever taking time off to treat
7  your wife for any incident?
8      A.  I don't recall at the moment, sir.
9      Q.  At any point did you ever report directly to
10  Frank Harris?
11      A.  A few times, I believe, sir.
12      Q.  And what was his role, to the best of your
13  understanding?
14      A.  The plant manager.
15          (Exhibit No. 5 presented.)
16      Q.  I'm going to show you what I've marked as
17  Exhibit No. 5.  This is Valvoline 89.  Do you see that
18  on your screen, Mr. Price?
19      A.  Yes, sir, I see this on my screen.
20      Q.  And then if we scroll to the bottom of this --
21  this is your signature on Exhibit No. 5; is that right?
22      A.  Yes, sir.
23      Q.  Do you recall anything, Mr. Price, about
24  receiving this final written warning in May of 2020?
25      A.  I don't recall, sir, at this moment.

Page 51

1      Q.  Do you know how you received Exhibit No. 5?
2      A.  I don't recall at this moment, sir.
3      Q.  And if we look at Exhibit No. 5 it says that
4  you had reached 14.5 attendance incidents.  Do you see
5  that?
6      A.  Yes, sir, I see it.
7      Q.  And it says, on April 28th, 2020, sick.  Do
8  you see that?
9      A.  Yes, sir, I do.
10      Q.  And the corrective action here it says, Craig
11  is receiving a final written warning and a three-day
12  suspension for his continues -- I think that's a typo --
13  attendance incidents.  Additional incidents can lead to
14  further discipline action up to and including
15  termination.  Do you see that?
16      A.  Yes, sir.
17      Q.  And do you recall in May of 2020 actually
18  being suspended for three days?
19      A.  I don't recall at the moment, sir.
20      Q.  You know, Exhibit No. 5 says that -- that you
21  have reached 14.5 attendance incidents.  Do you remember
22  seeing that?
23      A.  Yes, on the paper that you just showed.
24      Q.  Do you have any reason to believe that that
25  number was inaccurate at the time?

Page 52

1      A.  I don't recall it at the moment, sir.
2      Q.  Well, even sitting here today, do you believe
3  that number is inaccurate?
4          MR. ZIPKIN:  Objection.
5          MR. HAWPE:  What's the basis of the
6  objection?
7          MR. ZIPKIN:  In what way is it
8  inaccurate?  Are you talking about the points that are
9  on it or the comments on it?
10          MR. HAWPE:  I don't need a speaking
11  objection, Lew, I just need to be know the basis of the
12  objection.
13          MR. ZIPKIN:  Okay.  I'm here.
14      Q.  Mr. Price, I'll ask you again, that document
15  indicated you had 14.5 attendance points, right?
16      A.  Correct.
17      Q.  Do you have any reason to believe that as of
18  May 4th, 2020, you did not have 14.5 attendance points?
19      A.  I don't recall it at the moment, sir.
20      Q.  Do you recall who informed you that -- well,
21  you said you didn't even recall being suspended, right?
22      A.  I don't recall it at the moment, sir.
23          (Exhibit No. 6 presented.)
24      Q.  Show you what I've marked as Exhibit No. 6,
25  this is Valvoline 87.  Do you see Exhibit No. 6,

Page 53

1  Mr. Price?  Have you had a chance to look at Exhibit No.
2  6, Mr. Price?
3      A.  Yes, sir, I did.
4      Q.  And if you look at the bottom of Exhibit
5  No. 6, is that your signature at the bottom?
6      A.  I don't recall, sir.
7      Q.  Do you recall ever receiving the writeup in
8  Exhibit No. 6?
9      A.  I don't recall it at this moment, sir.
10      Q.  Well, in Exhibit No. 6 there's an issue that's
11  described in the center there about not having your
12  radio.  Do you see that?
13      A.  Yes, sir.
14      Q.  And that there was a tornado warning and that
15  everyone except you replied to the call to go to shelter
16  in place.  Do you see that?
17      A.  Yes, sir.
18      Q.  Do you remember any of your managers ever
19  disciplining you because you did not have your radio?
20      A.  I don't recall it at the moment, sir.
21      Q.  And I'm sorry, and I don't mean to be repetitive,
22  you don't remember receiving Exhibit No. 6?
23      A.  I don't recall it at the moment, sir.
24          (Exhibit No. 7 presented.)
25      Q.  I'm going to show you what I'm marking as

14 (Pages 50 to 53)

Craig Price, II  *  August 29, 2022

Page 54

1  Exhibit No. 7, which is Valvoline 25. Scroll up a
2  little bit. Let me know when you've had a chance to
3  look at that. Have you had a chance to look at Exhibit
4  No. 7?
5      A. Yes, sir.
6      Q. This is a final written warning dated
7  June 2nd, 2020. See that at the top? Do you recall
8  receiving Exhibit No. 7 while you were employed at
9  Valvoline?
10      A. I don't recall it at the moment, sir.
11      Q. At the bottom, do you see there is a -- note
12  that says, looks like CP II, I refuse to sign. Do you
13  see that?
14      A. Yes, sir, I do.
15      Q. Is that your signature, or your note, rather?
16      A. Yes, sir.
17      Q. And if we look at page 2, which is Valvoline
18  26, there's a handwritten note there. Is this a
19  handwritten note that you prepared? Have you had a look
20  at page 2 of Exhibit No. 7, Mr. Price?
21      A. Yes, sir.
22      Q. And is that your handwriting?
23      A. Yes, sir.
24      Q. And so going back to the first page, there are
25  a few issues in Exhibit No. 7 that I just wanted to

Page 55

1  briefly discuss with you. There is an allegation in
2  Exhibit No. 7 that you were wearing earbuds in the
3  warehouse. Do you recall any managers ever addressing
4  with you about wearing earbuds in the warehouse?
5      A. I don't recall it at the moment, sir.
6      Q. The policy was that you were not allowed to
7  wear earbuds in the warehouse, right?
8      A. I don't recall it at the moment, sir.
9      Q. There's also an allegation that you were not
10  following your work restrictions that we just saw in
11  Exhibit No. 7. Do you remember seeing that?
12      A. Yes, sir, I remember seeing it.
13      Q. And at some point you had -- you did have work
14  restrictions; is that right?
15      A. Yes, sir.
16      Q. And tell us about how that came about. You
17  injured yourself on the job, right?
18      A. Yes, sir.
19      Q. And how did you injure yourself?
20      A. Picking an order.
21      Q. When you say, picking an order, so what part
22  of your body was injured?
23      A. My lower back.
24      Q. And so were you lifting something that -- that
25  tweaked your back some?

Page 56

1      A. Yes, sir.
2      Q. And you went to -- to a doctor about that; is
3  that right?
4      A. Could you ask me in a different way, sir.
5      Q. Did you go to a doctor about this incident?
6      A. Yes, sir.
7      Q. Do you recall if you missed work for your --
8  your back injury?
9      A. No, sir.
10      Q. Just because it may be a bad question, Craig,
11  no, you didn't miss work or no, you don't remember if
12  you missed work?
13      A. I didn't miss work, sir.
14      Q. And when you go to the doctor, they give you
15  some restrictions that you -- you provided to the
16  company, right?
17      A. Could you repeat that question, sir, in a
18  different way.
19      Q. Well, yeah, sure. So you told me that you had
20  restrictions, right?
21      A. Yes, sir.
22      Q. And those restrictions were given to you by a
23  doctor, correct?
24      A. Yes, sir.
25      Q. And you provided those restrictions to the

Page 57

1  company?
2      A. No, sir. I didn't.
3      Q. How did the company get the restrictions then,
4  if you know?
5      A. Yes, sir. Mr. Jeffery Brown attended the
6  doctor with me and he had the restrictions.
7      Q. And what were those restrictions?
8      A. No heavy lifting, and to not be on my feet.
9  And I was also given meds.
10      Q. And in Exhibit No. 7, the allegation was that
11  you were not following the restrictions that -- that you
12  were supposed to follow; is that right?
13      A. Could you repeat that in a different way,
14  please.
15      Q. The allegation in the writeup, Craig, is that
16  you weren't following your restrictions, right?
17      A. Yes, sir.
18      Q. And what we saw in Exhibit No. 7, page 2, is
19  your handwritten statement where you dispute that,
20  correct?
21      A. Correct, sir.
22      Q. And the writeup that we just saw was signed by
23  Jeffery Brown, right?
24      A. I don't recall, sir, at this moment.
25      Q. Do you recall anything about how you received

15 (Pages 54 to 57)

Craig Price, II  *  August 29, 2022

Page 58

1   Exhibit No. 7?
2       A.  I don't recall at this moment, sir,
3       Q.  And just quickly looking again at Exhibit
4   No. 7 just briefly, it says that the corrective
5   action -- it says, Craig is receiving a three-day
6   suspension/final warning, under performance.  Additional
7   incidents can lead to further discipline action up to
8   and including termination of your employment.  Do you
9   see that?
10      A.  Yes, sir, I see.
11      Q.  Do you recall being suspended for three days
12  after -- after -- around this time?
13      A.  I don't recall it at this moment, sir.
14      Q.  Let me just ask a broader question, Mr. Price.
15  Do you recall ever being suspended by Valvoline?
16      A.  Yes, sir, I do.
17      Q.  How many times do you recall being suspended?
18      A.  Once.
19      Q.  Why were you suspended on the time that you
20  can recall?
21      A.  I don't recall it at this moment, sir.
22      Q.  Going back briefly to page 2 of exhibit number
23  seven, you say here at the bottom, the rules need to
24  apply to everyone and the nitpicking needs to stop.  Do
25  you see that?

Page 59

1       A.  Yes, sir, I do.
2       Q.  What did you mean by that?
3       A.  Yes, sir.  Basically just not -- be fair all
4   around to everybody, not just to certain individuals.
5       Q.  Who did you believe was being unfair to you?
6       A.  During that time, Dalan Motz, and at that
7   time, Jeffery Brown.
8       Q.  And how was Mr. Motz being unfair to you?
9       A.  Because at that time he was assistant plant
10  manager.
11      Q.  Yeah, and again, how was he being unfair to
12  you?
13      A.  I was working in a hostile work environment,
14  sir, and he had, you know, a lot to do with that,
15  dealing with me.
16      Q.  And when you say that he had a lot to do with
17  that, what was he doing, in your opinion?
18      A.  Nitpicking, sir.
19      Q.  And tell me all the ways that you believe he
20  was nitpicking on you.
21      A.  Certain comments, certain things that he would
22  say to other people, just certain ways that he would
23  treat me.
24      Q.  And I'm asking for a little bit more specific
25  than that, Mr. Price, what -- these certain comments,

Page 60

1   what were the comments that Mr. Motz was making?
2       A.  I don't recall at the moment, sir.
3       Q.  You said that Jeffery Brown was also
4   nitpicking you; is that right?
5       A.  Yes, sir.  That's what I felt to believe at
6   that moment.
7       Q.  And what did you believe that Mr. Brown was
8   doing that was nitpicking towards you?
9       A.  I felt that box writeup wasn't fair.
10      Q.  Did you believe that the box writeup was given
11  to you because of your race?
12      A.  In some ways, yes.
13      Q.  Why did you believe that?
14      A.  Because I'm an African-American male, and I was
15  working at Valvoline and Valvoline was -- had become
16  very hostile.
17      Q.  And Mr. Brown is African-American too, right?
18      A.  Yes, sir.
19      Q.  Do you believe that Mr. Brown was
20  discriminating against you on the basis of your race?
21      A.  No, sir.
22      Q.  Well, after you received Exhibit No. 7, do you
23  recall calling the HR hot line to lodge a complaint?
24      A.  I don't recall it at this moment, sir.
25      Q.  Do you recall ever making any complaint at

Page 61

1   Valvoline about your supervisors?
2       A.  I do, sir, I just don't recall at the moment
3   in time that I did so.
4       Q.  Well, let's set -- let's set time aside.  Do
5   you recall ever calling the HR hot line?
6       A.  Yes, sir.
7       Q.  How many times did you call the HR hot line?
8       A.  I don't recall at this moment, sir.
9       Q.  Was it more than once?
10      A.  I don't recall at this moment, sir.
11      Q.  Was it more than ten times?
12      A.  I don't recall at this moment, sir.
13      Q.  It was more than a hundred times?
14      A.  I'm sorry, sir.  I don't recall at this
15  moment.
16      Q.  So it could have been more than a hundred
17  times that you called the HR hot line?
18      A.  I don't recall at this moment.
19          MR. ZIPKIN:  Objection.  Objection.
20      Q.  Tell me -- you said that you called at least
21  once, what do you recall calling at least once about?
22      A.  I don't recall at the moment, sir.
23      Q.  Do you recall talking to anyone at HR about
24  the way that you believe that you're being treated?
25      A.  I don't recall it at this moment, sir.

Craig Price, II  *  August 29, 2022

Page 62

1    Q.  And just to be clear, Mr. Price, are you
2  saying that conversation may, may not happen, you just
3  don't remember today?
4    A.  What I'm saying is, sir, I don't recall at
5  this moment.
6    Q.  And I'm asking you, Mr. Price, what do you not
7  recall?  Do you not recall the specifics of the
8  conversation?
9    A.  I don't remember the times, how many times did
10  I call, sir.
11    Q.  But you remember calling at least once, right?
12    A.  Yes, sir.  I don't remember -- I don't
13  remember how many times I called at the time, sir.
14    Q.  And I just want to be really clear, Mr. Price,
15  sitting here today under oath you cannot tell us
16  anything about the one time that you can recall; is that
17  right?
18    A.  Yes, sir, I don't remember how many times I
19  called.
20    Q.  And again, sir, my question is not how many
21  times.  You've testified that you called at least once,
22  right?
23    A.  Yes, sir.
24    Q.  And I'm asking you, Mr. Price, do you recall
25  anything of the substance of that conversation?

Page 63

1    A.  I don't recall that at this moment, sir.
2    Q.  Is there anything that you would look at or
3  could look at that would refresh your memory of what you
4  discussed on the one time that you can recall?
5    A.  I don't recall it at this moment, sir.
6    Q.  Let's fast forward to your termination of
7  employment.  Prior to your termination, you had gone to
8  a wedding, correct?
9    A.  Yes, sir.
10    Q.  And after that wedding, you had become ill,
11  right?
12    A.  Yes, sir.
13    Q.  And after you became ill you called Mr. Frank
14  Harris, right?
15    A.  I don't recall at the moment, sir.
16    Q.  Well, you reported to someone at the company
17  that you were feeling ill, correct?
18    A.  Yes, sir.
19    Q.  Who did you report it to?
20    A.  Jeffery Brown.
21    Q.  What did you --
22    A.  My immediate supervisor.
23    Q.  Sorry, didn't mean to over -- talk over you.
24        What did you tell Mr. Brown at that time?
25    A.  That I wasn't feeling well, sir.

Page 64

1    Q.  And what was his response?
2    A.  I don't recall at the moment, sir.
3    Q.  When you say that you said you weren't feeling
4  well, did you give any more details other than that you
5  weren't feeling well?
6    A.  I don't recall it at this moment, sir.
7    Q.  Well, in fact, you had told someone that you
8  believe you had food poisoning, right?
9    A.  I don't recall it at this moment, sir.
10    Q.  Well, did you ever go to any doctor after this
11  incident of not feeling well?
12    A.  I did, sir.
13    Q.  And what doctor did you go to?
14    A.  I don't remember the name at this time, sir.
15    Q.  And did the doctor diagnose you with anything?
16    A.  I don't remember at this time, sir.
17    Q.  You agree you never provided that doctor's
18  note to the company, right?
19    A.  I wasn't given the opportunity to, sir.
20    Q.  So again, the answer to my question is no, you
21  never provided that?
22    A.  No, I never provided it.
23    Q.  Did you have any conversations with Mr. Harris
24  regarding the reason why you needed to be out in October
25  of 2020 after this wedding?

Page 65

1    A.  I don't recall it at this moment, sir.
2    Q.  Did you test for COVID after the wedding?
3    A.  I don't recall at this moment, sir.
4    Q.  Have you ever tested positive for COVID?
5    A.  I don't remember at this moment, sir.
6    Q.  You don't know if you've ever tested positive
7  for COVID?
8    A.  I don't remember at this moment, sir.
9    Q.  Did you ever tell Mr. Brown, the conversation
10  that you -- you testified earlier, that you believe that
11  you had COVID?
12    A.  I don't remember at this moment, sir.
13    Q.  What -- what was your understanding,
14  Mr. Price, of what the company's policy was at the time
15  regarding COVID?  In other words, if you as an employee
16  felt that you had COVID symptoms, what was your
17  understanding of what the policy was?
18    A.  My understanding simply was do not come on the
19  premises sick at any given time.
20    Q.  Do you recall -- well, let me ask you, how did
21  you find out, Mr. Price, that your employment was being
22  terminated?
23    A.  I was face-to-face with the plant manager, the
24  assistant plant manager and my supervisor.
25    Q.  And so just so that we're all on the same

17 (Pages 62 to 65)

Craig Price, II   *   August 29, 2022

Page 66

```
 1   page, that was Frank Harris is the supervisor -- I'm
 2   sorry, the plant superintendent, right?
 3        A.  He's the plant manager.
 4        Q.  And then the assistant manager was who?
 5        A.  Dalan Motz at that time.
 6        Q.  And then you said that your direct supervisor,
 7   is that Mr. Brown?
 8        A.  Yes, sir.
 9        Q.  And tell me what you recall of -- of what was
10   said during that meeting.
11        A.  That basically I had reached my point system.
12        Q.  And was there one person that was primarily
13   talking of those three guys?
14        A.  I don't recall at this moment, sir.
15        Q.  And what response, if any, did you have to
16   this idea that you had reached the maximum under the
17   point system?
18        A.  Could you repeat that, please.
19        Q.  Yeah.  What was your response when someone
20   tells you that you'd reached your maximum, what, if
21   anything, did you say in response?
22        A.  I simply replied back that I was following
23   protocol.
24        Q.  And do you recall what they said in response
25   to that?
```

Page 67

```
 1        A.  I don't recall it at this moment, sir.
 2        Q.  Is there anything else that you can recall
 3   about this meeting where you were informed that you were
 4   being terminated?
 5        A.  Yes, there are some things that I can recall.
 6        Q.  What else do you recall about that meeting?
 7        A.  I remember basically pleading, begging for my
 8   job, and asking to take a pay cut and ask why was I
 9   being terminated for following the rules.
10        Q.  And do you recall what response, if any, you
11   got to that?
12        A.  I don't recall it at this moment.  Everything?
13        Q.  And -- and I'm saying, sorry, Mr. Price, a
14   more general response or question, do you recall
15   anything else about what they said in response to your
16   statement that you just made?
17        A.  No, sir.  Honestly, I just recall my reactions
18   to everything.
19            MR. HAWPE:  Can we take a quick break?
20            THE VIDEOGRAPHER:  Off the record at
21   11:50.
22            (Recess from 11:50 a.m. to 12:05 p.m.)
23            THE VIDEOGRAPHER:  We are back on the
24   record at 12:05.
25        Q.  (BY MR. HAWPE)  So after your termination
```

Page 68

```
 1   meeting, Mr. Price, did you ever go back to HR to
 2   complain about your termination?
 3        A.  Yes, sir.
 4        Q.  And do you recall who you talked to?
 5        A.  Yes, sir.
 6        Q.  Who was that?
 7        A.  I don't remember her last name, but I believe
 8   her name is Ms. Mindy.
 9        Q.  And tell me about what you recall raising to
10   Mindy.
11        A.  Basically that I wanted to possible fight for
12   my employment at the job and to basically get a second
13   chance to see if I will be able to reapply.
14        Q.  And what did she tell you?
15        A.  At first she was very willing to help me, and
16   I'm assuming after a few days passed by she wasn't so
17   much willing after that anymore.
18        Q.  And when you say she wasn't willing, did she
19   say something to that effect?
20        A.  She kind of had like an attitude a few times
21   and on a few other times that I called, she wouldn't
22   answer the telephone or, you know, basically she just
23   didn't seem to care anymore.
24            (Exhibit No. 8 presented.)
25        Q.  I want to show you what I'll mark as Exhibit
```

Page 69

```
 1   No. 8.  This is Bates-stamped 35.  Do you see that on
 2   your screen, Mr. Price?
 3        A.  Yes, sir, I do.
 4        Q.  And PriceCraig23@yahoo, is that an e-mail
 5   address that you used?
 6        A.  Yes, sir.
 7        Q.  And do you recall receiving this e-mail from
 8   Mindy on November 13th, 2020?
 9        A.  I don't remember the date at this time, sir,
10   but I remember receiving the e-mail, yes.
11        Q.  And essentially, in Exhibit No. 8, Mindy, from
12   the employee relations group, is giving you your
13   attendance issues and points, or -- sorry, let me
14   rephrase that -- your attendance instances and points
15   where she's saying and showing you where you received
16   points.  Do you see that?
17        A.  Yes, sir, I do.
18        Q.  And do you recall if you responded to this
19   e-mail?
20        A.  I don't recall it at the moment, sir, if I
21   responded.
22        Q.  Stop sharing there just for a second.
23            At this point in the conversations with
24   Mindy, did you have a call that your wife joined in on?
25        A.  I don't recall that at the moment, sir.
```

Usher Reporting Services
(214) 755-1612

Craig Price, II   *   August 29, 2022

Page 70

1      Q.  So let me just ask you, Mr. Price, in the
2   e-mail we just saw in Exhibit No. 8, Mindy is saying at
3   that point you have nine total points, right?
4      A.  Yes, sir.
5      Q.  Do you believe that those nine points were
6   accurate when you received that e-mail from -- from
7   Mindy?
8          MR. ZIPKIN:  Objection.
9          You may answer.
10     Q.  Did you understand the question, Mr. Price?
11     A.  Could you repeat the question, sir.
12     Q.  Yeah.  In Exhibit No. 8 she's saying that you
13   had nine points and she's giving you the dates on which
14   every one of those points was incurred; do you remember
15   that?
16     A.  Yes, I remember the e-mail.
17     Q.  And sitting here today, do you believe that
18   those -- that that e-mail and that summary accurately
19   reflects the days that you were receiving points?
20     A.  Could you ask me one more time, please.
21     Q.  Sitting here today, Mr. Price, do you believe
22   that the e-mail in Exhibit No. 8 accurately reflects the
23   days that you incurred points at Valvoline?
24     A.  No, sir.
25     Q.  What is inaccurate about those dates in

Page 71

1   Exhibit No. 8?
2      A.  I don't know exactly what is inaccurate about
3   it, but I just don't personally -- I don't believe that
4   they're accurate, sir.
5      Q.  Why do you believe that they're not accurate?
6      A.  I actually, to my opinion, feel because of the
7   environment that I was working in.
8      Q.  Did you ever respond to anyone at the company
9   to indicate that the points that they said that you had
10   were inaccurate?
11     A.  I don't recall at this moment, sir.
12     Q.  We talked about the points system earlier,
13   Mr. Price, and that at certain point thresholds there
14   was a different level of discipline.  Do you recall
15   that?
16     A.  Yes, sir, I recall.
17     Q.  And you said that you -- you've seen the
18   attendance policy, right?
19     A.  Yes, sir.
20     Q.  And you're aware that the company's policy is
21   that at eight points, you are subject to termination; is
22   that correct?
23     A.  That's not correct, sir.  I don't remember
24   that.
25     Q.  Okay.

Page 72

1      A.  At this time.
2      Q.  Well, meaning you don't remember the specifics
3   of -- of the policy?
4      A.  At this moment, I don't remember specifics of
5   the policy, sir.
6      Q.  But you're aware that at a certain point
7   threshold the policy outlined that an employee would be
8   subject to termination if there was a certain amount of
9   points incurred.  Is that fair?
10     A.  Yes, to a certain degree.
11     Q.  When you say to a certain degree, what do you
12   mean?
13     A.  Because I -- at this particular moment, right
14   now at this moment, I don't remember exactly how many
15   points.  A lot has happened between then and now.
16     Q.  And I understand that.  I'm just trying to get
17   on the same page with you, Mr. Price, that the -- we're
18   on the same page that the policy does say that at a
19   certain point number you can be subject to termination?
20     A.  Yes, sir, I agree.  I'm just saying that I
21   don't recall at this moment the actual point number at
22   this moment.
23     Q.  And you would agree with me, Mr. Price, that
24   for -- well, let me ask it a different way.
25          In your role at Valvoline, did you have

Page 73

1   insight or visibility to what your coworkers' attendance
2   points were?
3      A.  No, sir.
4      Q.  When you -- going back to the conversation
5   after -- after you were informed of your termination,
6   you said that you reached out to Mindy in employee
7   relations; is that right?
8      A.  Yes, sir.
9      Q.  Did you ever tell her that you believed that
10   you were being treated differently from others?
11     A.  I don't recall it at the moment, sir.
12     Q.  Do you -- do you believe sitting here today,
13   Mr. Price, that you were treated differently than
14   others?
15     A.  Yes, I do.
16     Q.  Who do you believe that you were treated
17   differently than?
18     A.  First shift worker Dennis.  On my shift,
19   Robert Larry, Chadrick, Nathan or Nathaniel, Nate -- I
20   guess we could just say Nate for short.
21     Q.  I want to make sure -- some of those names I
22   couldn't tell if they were first and last names or
23   different.  You said Dennis, Rob, Chadrick and Nathan,
24   is that four people?
25     A.  I said, Dennis, yes, sir, and I said Robert

19 (Pages 70 to 73)

Craig Price, II   *   August 29, 2022

Page 74

1  Larry, which is one person, Chadrick and Nate.
2      Q.  Any other individuals that you thought that
3  you were treated differently than?
4      A.  At this moment, sir, I don't recall.
5      Q.  Tell me about why you believe you were treated
6  differently than Dennis.  Well, let me ask a different
7  question.  How were you treated differently than Dennis?
8      A.  Due to our race.
9      Q.  And what leads you to believe that?  When you
10  say due to your race, what -- what was he doing, in
11  other words -- well, do you believe that you and Dennis
12  did the same thing and that you were disciplined and he
13  wasn't?
14      A.  I feel that way, yes.
15      Q.  And what specifically leads you to that
16  belief?
17      A.  Basically, his attendance.
18      Q.  And what about his attendance?
19      A.  Could you ask me that a different way, please.
20      Q.  Yeah.  You said you were treated differently
21  based on his attendance, and I'm asking what do you mean
22  by that?
23      A.  Basically, I -- I would work on first shift
24  from time to time and he would -- hear things and in my
25  case, you would see things and that's why I felt that

Page 75

1  way.
2      Q.  And, you know, look, I'm not trying to put
3  words in your mouth, Mr. Price, but is it your belief
4  that he had earned just as many attendance points, if
5  not more, than you?
6      A.  In my belief, that's what I think and -- yes,
7  sir, that's what I believe.
8      Q.  And -- and help me understand, Mr. Price, why
9  do you believe that?
10      A.  Honestly, sir, Valvoline is -- it was a really
11  negative place, so word traveled fast regardless if it
12  was the truth or a rumor or if it was a lie or, I don't
13  know if you want me to say fear, but word travels around
14  there pretty accurately and a lot of times that's a lot
15  of stuff that transpired.  You would hear a lot about it
16  from your coworkers.
17      Q.  And so I -- I think if I understand that, you
18  had heard that Dennis had a lot of absences under the --
19  under the absence policy; is that correct?
20      A.  Yes.
21      Q.  And again, you don't know how many points he
22  had or didn't have.  Is that fair?
23      A.  That's fair to say, sir.
24      Q.  You mentioned that you felt that you were
25  treated differently than Rob Larry; how were you treated

Page 76

1  differently than Mr. Larry?
2      A.  In a particular meeting that we had, Frank
3  Harris himself asked Robert Larry could he pick on him
4  to use him as a truthful example about attendance
5  policies and he verbatim said, Robert Larry is on his
6  last leg and he can't miss any more days.
7      Q.  And how -- how in your mind, Mr. Price, was
8  that treating you differently or treating him
9  differently?
10      A.  Because shortly after that Robert Larry missed
11  work.
12      Q.  And do you know the circumstances of -- of why
13  he missed work?
14      A.  Yes, sir.  Robert Larry and I had a pretty
15  okay relationship at work, and I was told that he
16  basically missed work because of a back injury due to
17  picking up his daughter.
18      Q.  And approximately when did this occur?
19      A.  I don't have the approximate date nor time at
20  this moment, sir.
21      Q.  Was it close to the time of your termination?
22      A.  I don't recall it at this moment, sir, sorry.
23      Q.  And you talked earlier about the attendance
24  policy, that these points stay on your -- on your
25  record, so to speak, for a year, right?

Page 77

1      A.  Yes.
2      Q.  So, you know, in October 2020, we would go all
3  the way back to October of '19 to look at that 12-month
4  window as to how many points you had earned; is that
5  fair?
6      A.  Yes, sir.
7      Q.  Meaning that anything prior to October doesn't
8  count, right?
9      A.  Could you repeat that one more time, sir.
10      Q.  Yeah.  In your instance in -- and, you know,
11  this all comes to a head in October of '20, you go back
12  to October of '19.  Anything that happened prior to
13  October of '19 doesn't count for the purposes of the
14  point system.  Is that fair?
15      A.  Yes.
16      Q.  Any other ways that you believe that Rob Larry
17  was treated differently than you?
18      A.  Yes, sir.
19      Q.  How -- how so?
20      A.  Personal -- personally feel as if because he
21  worked in the office, in the shipping office, he had
22  more -- I can say more work to bring to the table as
23  opposed to me just being a loader and an unloader.
24      Q.  Help me understand what you mean by that about
25  bringing more work to the table.

20  (Pages 74 to 77)

Craig Price, II  *  August 29, 2022

Page 78

1    A.  Basically saying he had more to bring as a
2  worker as opposed to just not being a physical labor
3  worker.  He could go inside of the shipping office and
4  work at the computer, he could do the scheduling and the
5  unscheduling as opposed to myself, I was basically just
6  a floor worker.
7    Q.  So is it fair -- I'm sorry, I didn't mean to
8  interrupt.
9    A.  Basically saying that he was more of a, I
10  guess, attribute to the company if that makes sense.
11    Q.  Do you know what Mr. Larry's title was?
12    A.  I actually don't, sir.
13    Q.  Is it fair to say, Mr. Price, that you and
14  Mr. Larry, you didn't have the same job; is that right?
15    A.  I don't recall at this moment, sir.
16    Q.  Well, he was working in the office and you
17  weren't, right?
18    A.  No, sir.  It would kind of be in and out, he
19  would work on the floor, he would work in the office
20  when they would, you know, just work in the floor, work
21  in the office.  Like I say, every day you would have a
22  different task, nobody basically had the same task
23  regardless if you were a picker or not.  They may need
24  help in receiving.  If you normally ship every day, if
25  they needed help in receiving, then they may take this

Page 79

1  person that normally picks and put him in receiving and
2  vice versa.  They just basically tried to fill in the
3  gaps when needed.
4    Q.  Do you know who Mr. Larry reported to, who was
5  his direct supervisor?
6    A.  Mr. Jeffery Brown, sir.
7    Q.  Going back to Dennis, do you know who Dennis
8  reported to?
9    A.  Mr. Jarvis Wright, Sr.
10    Q.  You said that you also felt that you were
11  treated differently than Chadrick.  I'm sorry.
12  Chadrick, is that right?
13    A.  Yes, sir.
14    Q.  Do you remember Chadrick's last name?
15    A.  I believe that it's Chavez -- I'm sorry,
16  Chavez.  Yes, Chavez.
17    Q.  And how do you believe that he was treated
18  differently than you?
19    A.  Basically the same example that I just gave to
20  you about Robert Larry.  He was one of the guys that
21  could work in the shipping office.  They were kind of
22  like all-around workers.
23    Q.  And just to be clear, Mr. Price, with respect
24  to Mr. Larry, you talked about his attendance issues.
25  Is it your belief that Mr. Chavez had similar attendance

Page 80

1  issues?
2    A.  Yes, sir.
3    Q.  And do believe that he had the same or more
4  points than you had?
5    A.  Yes, sir.
6    Q.  And again, you wouldn't have firsthand
7  knowledge as to how many points he had or didn't have.
8  Is that fair?
9    A.  No, sir.  But when your -- your plant manager
10  says certain things, you kind of, you know, tend to, you
11  know, hold on to it or in my case, believe it.
12    Q.  And what was said with respect to Mr. Chavez?
13    A.  Just basically that, you know, he kind of was
14  on his last leg as well regarding attendance policy.
15    Q.  And what about Nate, you said that you believe
16  he was treated differently than you.  First, do you
17  remember Nate's last name?
18    A.  No, sir.  I don't remember his last name.
19    Q.  How do you believe that you were treated
20  differently than Nate?
21    A.  Simply because of a few incidents that
22  occurred and that he and Dalan were extremely close.
23    Q.  And what are these incidents that you're
24  referring to?
25    A.  When I was on light duty, I was still told to

Page 81

1  go out in the warehouse.  When Nathan or Nate was on
2  light duty, Nate was in the office shredding papers.  I
3  put in -- I had been trying to get on first shift for
4  the longest, and you know, they told us that it went by
5  seniority.  Nate had got placed on first shift.
6    Q.  As part of his light duty?
7    A.  No, sir.
8    Q.  So after his light duty ends or before his
9  light duty, when did he get placed on first shift?
10    A.  I don't recall at this moment, sir.
11    Q.  Are there any other individuals, Mr. Price,
12  that you believe received better treatment than you?
13    A.  At the moment, I don't recall, sir.
14    Q.  You said that you -- at some point you
15  reported to Jarvis Wright, Sr.; is that right?
16    A.  I don't remember at this moment, sir.
17    Q.  You don't know if he was ever your supervisor?
18    A.  Honestly, sir, I don't recall at this moment.
19    Q.  At some point you reported to Jamie Langford
20  (sic); is that right?
21    A.  No, sir, that's the wrong last name, sir.
22    Q.  What is the right last name?
23    A.  Langston.
24    Q.  Did you report to Mr. Langston?
25    A.  I don't recall at this moment, sir.

21 (Pages 78 to 81)

Craig Price, II * August 29, 2022

Page 82

1    Q. Well, he's the individual that you said called
2    you a lazy boy, right?
3    A. Yes, sir.
4         Sorry. Phone was dying so I switched.
5    Q. Yeah, no worries.
6         And so you said that you don't remember if
7    you reported to him or not?
8    A. If you could, sir, could you give me one
9    minute, I'm trying to adjust my volume. Could you
10   repeat that, please, sir.
11   Q. Yeah. My question was you said you didn't
12   recall if you reported to Mr. -- to Jamie?
13   A. Jamie was assistant plant manager, sir, so...
14   Q. Did you have a good working relationship with
15   Jeff Brown?
16   A. It didn't start out so good, sir, but it
17   eventually got there.
18   Q. What -- from your perspective, how did it not
19   start off so good?
20   A. I personally felt as if with certain
21   situations that -- and this is my opinion, I'm not
22   saying that it's right, sir, I'm just saying from my
23   personal opinion I felt that I was being picked on.
24   Q. Did he say anything to you about the decision
25   to terminate your employment? You mentioned that he was

Page 83

1    in that -- in that meeting, did he say anything?
2    A. No, sir. He didn't. He didn't say anything.
3    Q. I'm sorry.
4    A. No, that's fine, you can go ahead.
5    Q. Have you talked to Mr. Brown since the
6    termination of employment as to whether he agreed with
7    that decision or not?
8    A. I have a question, Mr. Jeremy, when you said
9    meaning that Mr. Jeff said anything, could you answer --
10   could you ask me that differently and be a little bit
11   more specific, please, sir.
12   Q. Yeah. Has he ever told you whether he agreed
13   with the termination decision or not?
14   A. Yes, sir, he has, but he didn't say it in that
15   meeting, but we discussed that.
16   Q. And what has he told you about the decision to
17   terminate?
18   A. When I was -- when he was actually walking me
19   to the front to leave the premises that he didn't agree
20   with it.
21   Q. Did he say any more about why he didn't agree
22   with it?
23   A. At this moment, sir, I don't recall.
24   Q. Did -- you mentioned -- let's talk about Dalan
25   Motz just briefly. To the best of your knowledge,

Page 84

1    Mr. Price, has Mr. Motz ever made any comments that you
2    believe are racist?
3    A. Yes, sir.
4    Q. And what -- what comments has he made?
5    A. You people always want something free.
6    Q. And is that with respect to the T-shirt
7    incident that you talked about earlier?
8    A. Yes, sir.
9    Q. Okay. Any other comments that you believe
10   that Mr. Motz has made that are racist?
11   A. No, sir. Not at this moment.
12   Q. Frank Harris, are there any comments that
13   you're aware of that you believe that Mr. Harris made
14   that are racist?
15   A. Not at this moment, sir, I can recall.
16   Q. Do you believe that Mr. Frank Harris ever
17   treated you differently because of your race?
18   A. Yes, sir, I do recall -- yes, sir, I feel so.
19   I'm sorry about that.
20   Q. And how did Mr. Harris treat you differently?
21   A. Simply, sir, I was trying to get better
22   knowledge about where I stood on my point system, and I
23   went to Mr. Frank a few times -- well, more than a few
24   times, I went to Mr. Frank and I repeatedly asked him
25   for my attendance policy, where I stood, what my points,

Page 85

1    and he would kind of, you know, brush me to the side. I
2    remember him telling me that I was doing okay and that I
3    was doing good and I didn't need to worry about it and
4    him printing out the paperwork would be too much work.
5    Q. Are there any other ways, Mr. Price, that
6    Frank Harris treated you differently?
7    A. At this moment, I can't recall.
8    Q. Do you know if Mr. Harris printed out
9    attendance reports or attendance summaries for any of
10   your other colleagues?
11   A. Yes, sir.
12   Q. Who did he do that for?
13   A. Robert Larry.
14   Q. How do you know that he did that for Robert
15   Larry?
16   A. We were in the locker room when he discussed
17   it and said it. And also, Mr. Frank said that he didn't
18   mind printing them out. That's why I didn't understand
19   why it would be such an issue for me.
20   Q. And Dalan Motz, do you believe that Dalan Motz
21   treated you differently because of your race?
22   A. Yes, sir.
23   Q. How did he treat you differently?
24   A. Again, sir, comments, the way that I would
25   volunteer to do certain things and the way that I worked

22 (Pages 82 to 85)

Craig Price, II  *  August 29, 2022

## Page 86

1  and did other things, I would be kind of basically, I
2  guess, tried to be made an example of.
3      Q.  Tell me what you mean by that when you said
4  being made the example of.
5      A.  Well, particularly I worked on the receiving
6  side, and I was removed from the receiving side because
7  I'm assuming that he thought that I didn't -- that I
8  wasn't a good picker, that I couldn't pick, and I was
9  told that that's the reason he moved me from the
10  receiving side to basically make me pick and not be
11  successful at it.
12      Q.  Did you ever address that directly with
13  Mr. Motz?
14      A.  I don't recall at the moment.
15      Q.  When you were moved to the receiving side, did
16  you -- was there any change to your compensation?
17      A.  Well, I was moved to the shipping side, and
18  no, sir, there wasn't any change.
19      Q.  Is there any other ways that you believe that
20  Mr. Motz treated you differently than other -- other
21  coworkers.
22      A.  Yes.  I -- he yelled at me one time for asking
23  a question about a work order.
24      Q.  When you say he yelled at you, what did he
25  say?

## Page 87

1      A.  I don't recall at the moment what he said, but
2  I remember him raising his voice.
3      Q.  Had you ever heard him raise his voice to
4  anyone else?
5      A.  No, sir, I hadn't.
6      Q.  Did you ever address it with him?
7      A.  I actually did.
8      Q.  And what did he say?
9      A.  Nothing.  He did his little laugh that he
10  does.
11      Q.  Just broadly, Mr. Price, are there any other
12  comments in the workplace made by any managers that you
13  believe were discriminatory or racist?
14      A.  At the moment, I can't recall, sir.
15      Q.  The issues that you had with Mr. Motz, did you
16  ever address those with Frank Harris, for example?
17      A.  Yes.
18      Q.  Tell me what you recall of addressing them
19  with Mr. Harris.
20      A.  Basically, Mr. Harris is the one that ordered
21  the shirts for me for the bonus that I was asking Dalan
22  about.  And initially, when I said something to
23  Mr. Frank about it, he kind of brushed it off.  He
24  didn't say anything, and once the shirts got ordered in,
25  I let them know that they were the wrong size and the

## Page 88

1  wrong color that I wanted and he basically just brushed
2  it to the side.
3      Q.  Any other instances that you addressed with
4  Mr. Harris about Mr. Motz?
5      A.  At this moment, I can't recall.
6      Q.  Did you ever address with Mr. Harris any
7  treatment that you thought that you were getting from
8  Jeffery Brown?
9      A.  At this moment, I don't recall detail, sir.
10      Q.  You told me at the beginning, Mr. Price, that
11  you had reached out to Chadrick Chavez and discussed him
12  being a witness in -- in this case.  Is that fair?
13      A.  That's fair.
14      Q.  What do you believe that he knows about the
15  reasons for your termination of employment?
16      A.  Honestly, personally, I believe -- not saying
17  that it's right, but I believe that he feels as if
18  they -- I was terminated for the wrong reason, that I
19  was mistreated fair.
20      Q.  Do you know --
21      A.  (Inaudible.)
22      Q.  I'm sorry?
23      A.  (Inaudible.)
24      Q.  Do you know if he's still employed by
25  Valvoline?

## Page 89

1      A.  I don't know, sir, I haven't spoken with him
2  in a while.
3      Q.  You said that you also asked Mr. Thomas to --
4  to be a witness.  What do you believe that Mr. Thomas
5  knows about the reasons for your termination?
6      A.  Well, sir, I never asked Mr. Thomas.
7      Q.  You never asked Mr. Thomas to be a witness?
8      A.  No, sir.  I only had two people that I wanted
9  to ask and the two people that I wanted to ask didn't
10  want to do it.
11      Q.  And who were the two people that you wanted to
12  ask?
13      A.  Chadrick Chavez and Michael Preston.
14      Q.  And what did you believe that Mr. Preston
15  knew?
16      A.  I actually had a really good relationship with
17  Mr. Preston and he knew a lot.
18      Q.  Do you believe he had any information about
19  the reasons for your termination of employment?
20      A.  I don't know if he had any reasons, I just
21  felt that he could speak on my behalf.
22      Q.  Do you know if he was involved in the decision
23  to terminate your employment?
24      A.  I don't know if he was or wasn't, sir.
25      Q.  Since -- if we had a fast forward, Mr. --

23 (Pages 86 to 89)

Craig Price, II   *   August 29, 2022

Page 90

1    Mr. Price, you know, your employment was terminated in
2    October of 2020.  Sitting here today, between October
3    of 2020 and here at the end of August of 2022, have you
4    been in good -- in good health?
5        A.  In my opinion, no.
6            MR. ZIPKIN:  Objection.
7            You may answer.
8        Q.  Have you gone to any doctors for anything that
9    you believe has been caused by Valvoline?
10       A.  I haven't went to any doctors.
11       Q.  When you say that you don't believe that
12   you're in good health, what leads you to that belief?
13       A.  I can be honest.  My sleeping habit has not
14   been the same since I was terminated, confidence level,
15   my wife and I have had countless issues, financially,
16   with my wife having to tote everything, and just, you
17   know, a lot of -- to be honest with you, I have been
18   traumatized behind it and I'm still traumatized behind
19   it now.  That's the company that I wanted to retire and
20   work from.  And my mental state is not the same, like I
21   say, it -- it plays a part in just feeling like that I'm
22   not good enough for a company or a job when my main
23   intent is to go in and do a good job.
24       Q.  You told me earlier that you had been
25   terminated from Triple-S Steel, right?

Page 91

1        A.  Yes, sir.
2        Q.  Did you suffer the same type of sleeplessness
3    and confidence levels after that termination?
4        A.  I did, sir.
5        Q.  You said that you had been terminated from
6    North Shore Steel.  Did you suffer these confidence
7    level issues and sleeping habits after being terminated
8    from North Shore?
9        A.  Yes.
10       Q.  Of all the places that you've worked,
11   Mr. Price, have you ever claimed, either internally or
12   externally, that you were treated differently because of
13   your race?
14       A.  Valvoline was the only place, sir.  That was
15   my most -- my most hostile place that I worked at, the
16   most that I felt it, sir, Valvoline.
17       Q.  You say that it was the most hostile.  Do you
18   recall in December of 2020 reaching out to Mr. Harris
19   asking for your job back?
20       A.  Yes, I recall.
21       Q.  Why did you want your job back if it was the
22   most hostile place you'd worked?
23       A.  Because I was still providing for myself and
24   my wife.
25       Q.  And what did -- what did Mr. Harris tell you

Page 92

1    in response to your request?
2        A.  He told me that he would think about it and he
3    would reach back out and if he didn't reach back out, to
4    give him a call back.
5        Q.  And did he reach back out?
6        A.  No, sir.  He didn't.
7        Q.  And did you follow back up with Mr. Harris?
8        A.  I did.
9        Q.  And I assume you just never heard from him?
10       A.  No.  We've talked.
11       Q.  And what did he tell you?
12       A.  It was a little hostile, but basically, he
13   told me that he wouldn't -- he wouldn't bring me back.
14       Q.  And did he say why?
15       A.  I don't recall at this moment, sir, but I
16   remember us talking.
17           MR. HAWPE:  Let's take a quick break and
18   I think we'll be done.
19           THE VIDEOGRAPHER:  Off the record at
20   12:43.
21           MR. ZIPKIN:  We would agree to go off the
22   record and look forward to your return.
23           (Recess from 12:44 p.m. to 12:56 p.m.)
24           THE VIDEOGRAPHER:  Back on the record at
25   12:56.

Page 93

1        Q.  (BY MR. HAWPE)  Mr. Price, just a few more
2    questions.  You talked about earlier that -- would it be
3    fair to say that you and Mr. Jeff Brown had some
4    disagreements at the beginning of your -- your time at
5    Valvoline?
6        A.  Yes.
7        Q.  Seems like your phone is not wanting to stay
8    propped up.
9            MR. ZIPKIN:  Could you repeat that
10   question, I didn't hear it, please.
11       Q.  Well, he's already answered, but the question
12   that I asked was whether he and Mr. Brown had some
13   disagreements at the beginning of his time at Valvoline.
14           MR. ZIPKIN:  I did hear that answer.
15       Q.  And so, Mr. Price, fair to say that I think
16   you said that at some point the relationship between you
17   and Mr. Brown improved; is that right?
18       A.  Yes.
19       Q.  And was it your belief that it improved while
20   you were still at Valvoline?
21       A.  Yes, sir.  It did.
22       Q.  And was there anything, at least from your
23   perspective, that was the turning point, like what made
24   it better, did it just seem to kind of change overnight?
25       A.  It -- Mr. Jeff and I had a conversation.

24 (Pages 90 to 93)

Craig Price, II  *  August 29, 2022

Page 94

1     Q.  And tell me about that conversation.
2     A.  I basically apologized to Mr. Jeff for raising
3  my voice at him, but I told him that moving forward, you
4  know, that I would just do better.
5     Q.  And are you aware that Mr. Brown no longer
6  works at Valvoline?
7     A.  Could you repeat the question, sir.
8     Q.  Are you aware that he no longer works at
9  Valvoline?
10    A.  Yes.
11    Q.  And you've told Mr. Brown about your claims
12  against the company, right?
13    A.  No.
14    Q.  You've never told him that you have a legal
15  claim against the company?
16    A.  Not that I recall at this moment, sir.
17    Q.  Has Mr. Brown ever told you that he has legal
18  claims against the company?
19    A.  Not that I can recall at this moment, sir.
20    Q.  I'm going to show you what I'm marking as
21  Exhibit No. 9.  This is -- it's an unBates document that
22  your counsel provided in discovery.  It's an August 1,
23  2021, letter from Jeff Brown.  It's kind of -- get it
24  all on one page.  Do you see that, Mr. Price?
25          (Exhibit No. 9 presented.)

Page 95

1     A.  Yes.
2     Q.  Have you ever seen that prior to today?
3     A.  Yes, I have.
4     Q.  Did you ever ask Mr. Brown to put together
5  this statement?
6     A.  I did.
7     Q.  What -- why did you ask him to put together
8  this statement?
9     A.  Because at first I wasn't sure if I was going
10  to, but I thought about getting legal help or try to get
11  my job back.
12    Q.  Just to go through these paragraphs here.  In
13  that second paragraph that starts with around July,
14  August of 2020; do you see that?
15    A.  Yes.
16    Q.  Because I was having a conversation with Frank
17  Harris and he said we needed more diversity in our
18  workplace.  Just -- just to be clear, Mr. Price, you
19  weren't part of that conversation; is that right?
20    A.  No.  I wasn't directly a part of it, but if I
21  not mistaken, I was in the area of it because if I'm --
22  I personally believe that that was after our -- I think
23  the new PTO meeting that we just had, but I wasn't,
24  like, directly a part of the conversation.
25    Q.  Well, did you hear Mr. Harris say that we

Page 96

1  needed more diversity in the workplace?
2     A.  I don't recall at this moment, sir.
3     Q.  In the third paragraph it says, in September I
4  gave Craig a gift card because of his excellent work he
5  was doing.  Do you recall getting a gift card?
6     A.  Yes, sir, I do.
7     Q.  And it says, the second line is, I remember
8  Craig mentioned it to Dalan Motz and Dalan made the
9  comment, quote, you people always want something -- want
10  something for free.  Do you see that?
11    A.  Yes, sir.
12    Q.  You told me that that comment that Dalan made
13  was with respect to the shirts, right?
14    A.  Yes, sir.  It was.
15    Q.  So fair to say that this was incorrect, that
16  it was not about the gift card?
17    A.  Yes, that's correct.
18    Q.  Yes, it's correct that it's incorrect?  Sorry.
19  I just want to make sure we're on the same page.
20    A.  That statement that Dalan made was about the
21  T-shirts and during that day possibly Mr. Jeff may have
22  misunderstood, but that -- the comment that he made was
23  about the T-shirts, it wasn't about the gift card.
24    Q.  Got it.  And just to be clear, when you
25  received Exhibit No. 9, the statement from Mr. Brown,

Page 97

1  this is prior to you filing a lawsuit?
2     A.  I don't understand the question.
3     Q.  Well, I think -- I just want to make sure I'm
4  clear.  You said that you reached out and got this
5  statement because you were thinking about filing a claim
6  against the company.  Did I hear that correctly or did I
7  get that wrong?
8     A.  I was saying because I was thinking about
9  trying to get my job back.
10    Q.  And you thought that this statement would help
11  you get your job back?
12    A.  I thought it would, I thought it could help.
13  At this point I just wanted to be back at Valvoline
14  regardless of what I dealt with.  It was a good company
15  to work for and I didn't mind having to deal with the
16  things that I dealt with because, you know, you're going
17  to have to deal with stuff on jobs and Valvoline is a
18  great company to work for.  Yeah, I deal with stuff, but
19  the company itself, not the work environment that I was
20  in, it was a company, you know, it's -- I can't help it,
21  you know, that I'm African-American, but I definitely
22  wanted that job to provide for my wife because it wasn't
23  easy getting a job during the pandemic, so I was willing
24  to deal with whatever I had to deal with until things
25  got better in the economy.  So yes, sir, it's -- my

25  (Pages 94 to 97)

Craig Price, II  *  August 29, 2022

Page 98

1    thing was I just wanted to come back to Valvoline until
2    things got better in the economy.
3        Q.  You mentioned providing for your family.  I
4    want to go back to -- you mentioned that you suffered
5    some financial hardship after your termination; is that
6    right?
7        A.  Yes, sir.
8        Q.  I'm going to let you fix your phone before I
9    finish my questions here.
10       A.  Yes, sir.
11       Q.  Since your termination from Valvoline, have
12   you had anything repossessed?
13       A.  No, sir.  But it is in that -- it has been in
14   that status.
15       Q.  When you say it's been in that status, what do
16   you mean?
17       A.  It has been in repossession status.
18       Q.  And are we talking about your vehicle?
19       A.  Yes.
20       Q.  But sitting here today it has not been
21   repossessed?
22       A.  No.  It hasn't.
23       Q.  And what -- what vehicle do you currently
24   drive?
25       A.  I drive a Chrysler 300.

Page 99

1        Q.  What year is it?
2        A.  It's a 2016 model.
3        Q.  Have you filed for bankruptcy?
4        A.  No, sir.  I haven't.
5        Q.  You talked about your -- your wife and her
6    employment, you said that she's still employed, right?
7        A.  Yes.
8        Q.  Is she making the same or more or less than
9    she was making when you were at Valvoline?
10       A.  I don't recall at this moment how much my wife
11   was making.
12       Q.  Well, I'm not asking how much, I'm just
13   asking --
14       A.  Well, I don't -- at that time, sir I didn't --
15       Q.  No, I'm not talking about that time,
16   Mr. Price, I'm talking about sitting here today.
17       A.  Well, today, sir, I don't know what my wife
18   makes.  At this moment I don't know what she makes, I
19   just know that I was bringing in -- we had a two-income
20   household.  And we had that during the pandemic and it
21   wasn't easy getting another job during the pandemic,
22   especially a job that paid somewhat what Valvoline paid
23   with the same perks and benefits.
24       Q.  And you don't recall how long you were without
25   a job between Valvoline and going back to North Shore;

Page 100

1    is that right?
2        A.  I don't recall at this moment, sir.
3        Q.  And again, you don't recall how long you've
4    been without a job, sitting here today?
5        A.  I don't recall at this moment, sir.
6        Q.  Okay.  With that, I'll pass the witness.
7            MR. ZIPKIN:  Thanks, Jeremy.
8            COURT REPORTER:  Mr. Gross or Mr.
9    Zipkin --
10           MR. GROSS:  On mute.
11           MR. ZIPKIN:  I'm sorry, I couldn't hear.
12           COURT REPORTER:  I'm sorry.  This is the
13   court reporter.  Will the witness read and sign?
14           MR. ZIPKIN:  No, we want to read, please.
15           COURT REPORTER:  Do you need a copy?
16           MR. ZIPKIN:  Has an original been
17   ordered?
18           COURT REPORTER:  Yes, sir.
19           MR. ZIPKIN:  Let me get back to you on
20   that, please.  Will you communicate with us --
21           COURT REPORTER:  Yes, sir.
22           MR. ZIPKIN:  -- as to the cost?
23           Thanks, I appreciate that.
24           COURT REPORTER:  Thank you.
25           THE VIDEOGRAPHER:  Ending deposition --

Page 101

1            MR. ZIPKIN:  Thank you.
2            MR. HAWPE:  Stefanie, I can send you all
3    these exhibits --
4            COURT REPORTER:  Can we go off the
5    record?
6            THE VIDEOGRAPHER:  Want to go off the
7    record?
8            MR. HAWPE:  Yeah.  Sorry.
9            THE VIDEOGRAPHER:  End of deposition, off
10   the record at 1:06.
11           (Deposition concludes at 1:06 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

26  (Pages 98 to 101)

Craig Price, II  *  August 29, 2022

Page 102

```
 1              CHANGES AND SIGNATURE
 2    WITNESS NAME: CRAIG PRICE, II
      DATE OF DEPOSITION: AUGUST 29, 2022
 3    PAGE LINE    CHANGE         REASON
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13         I, CRAIG PRICE, II, have read the foregoing
14    deposition and hereby affix my signature that same is
15    true and correct, except as noted above.
16
17         _____
             CRAIG PRICE, II
18
19    THE STATE OF _____)
20    COUNTY OF _____)
21         Sworn to and subscribed before me on the _____ day
22    of _____, _____, by CRAIG PRICE, II.
23
             _____
24             NOTARY PUBLIC
25
```

Page 103

```
 1         STATE OF TEXAS    )
 2         I, Stefanie Andrews, Certified Shorthand Reporter
 3    in and for the State of Texas, hereby certify to the
 4    following:
 5         That the witness, CRAIG PRICE, II, was duly sworn
 6    by the officer and that the transcript of the oral
 7    deposition is a true record of the testimony given by
 8    the witness;
 9         That the time used by counsel for the parties is as
10    follows:
11         Mr. Kevin M. Gross - 00 Hours:00 Minutes
12         Mr. Jeremy W. Hawpe - 02 Hours:28 Minutes
13         Further, I am not a relative or employee of any
14    attorney of record in this cause, nor am I financially
15    or otherwise interested in the outcome of the action.
16         CERTIFIED by me on this the 12th day of September,
17    2022.
18
19         _____
             Stefanie Andrews, Texas CSR 5384
20           Expiration Date:  4/30/24
21           Usher Reporting Services
             1326 Lochness Drive
22           Allen, Texas 75013
             (214) 755-1612
23
24
25
```

27 (Pages 102 to 103)