**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CRAIG PRICE, II, | ) | CIVIL ACTION NO. 4:21-CV-03683 |
| | ) | |
| Plaintiff, | ) | JUDGE ALFRED H. BENNETT |
| | ) | |
| v. | ) | **PLAINTIFF'S BRIEF IN** |
| | ) | **OPPOSITION TO DEFENDANT'S** |
| VALVOLINE, LLC, | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendants. | ) | |

Now comes the Plaintiff, Craig Price, II, by and through undersigned counsel, and hereby respectfully requests that this Honorable Court deny the Motion for Summary Judgment filed by the Defendant, Valvoline, LLC.

**I.   STATEMENT OF MATERIAL FACTS.**

Plaintiff Craig Price, II, was born in Houston, Texas on May 10, 1987, and he grew up in the Fifth Ward. Price graduated from Forest Brook High School (now Forest Brook Middle School) in 2005. (Ex. 1, Price Dep. at 13:19–21; 17:3–12.) According to a November 1, 2007 article in the Houston Chronicle[1], Forest Brook High School was one of "42 Houston-area high schools deemed to have dangerously high dropout rates in a study by researchers at Johns Hopkins University[.]" Without the means to attend college following his high school graduation in 2005, Price went into the workforce in Houston. Price eventually met his wife, Kendra, a police officer for the Metropolitan Police Department, and the couple reside in Humble, Texas. (Price Dep. at 5:13–5; 13:22–14:24.)

---

[1]   Gary Scharrer, *Report Points to 'Dropout Factories'*, HOUSTON CHRONICLE, Nov. 1, 2007, http://www.chron.com/disp/story.mpl/front/5259695.html.

1

In March of 2019, Defendant Valvoline, LLC hired Price to be a "loader/unloader" and assigned him to work at its warehouse located at 1302 Wharton Weems Boulevard, La Porte, Texas. (*Id.* at 18:18–22.) As a loader/unloader, Price's job duties included: (1) safely operating a forklift to assist in receiving, storing, picking, staging and loading inventory; (2) utilizing systems and equipment to prepare and load customer orders for shipment; (3) receive, store, and replenish inventory; (4) properly prepare materials and load materials onto export containers for overseas shipments; (5) conduct inventory counts; (6) accurately complete necessary paperwork for all transactions; (7) complete SAP/Scan Gun transactions; and (8) complete all EHS training and job related training on a timely basis. (*See id.* at 27:18–24.)

Frank Harris, Plant Manager at the La Porte warehouse, testified Price "was a fast paced, high energy [sic] employee that was capable of doing a great job for us. Q. And did he? A. Yes." (Ex. 2, Harris Dep. at 24:13–25:4; 64:1–9.) Unfortunately, despite his recognized qualifications and performance as a loader/unloader, Price's employment at Valvoline was strained because of race-related remarks directed to him in the workplace. Price testified, "[I was] working in a hostile environment being an African American male." (Price Dep. at 44:22–3.) Price testified that Jamie Langston, Frank Harris, and Dalan Motz all subjected him to "different treatment from other races and other employees that [he] worked with[,]" and that all three of these Caucasian men repeatedly expressed "[d]isrespect and hostility and racism" in the workplace. (*Id.* at 45:1–2, 4.)

Jamie Langston, Assistant Plant Manager and Price's supervisor, yelled at Price that he was a "lazy boy." (Price Dep. at 31:2–14; 45:17–47:16.) Langston, a Caucasian, called Price "a lazy boy" because "the shift had just started and [Price] was trying to get a forklift to work and [Price] wasn't able to[,] and [Langston] started raising his voice, saying—it escalated and, you know, went from there and [Langston] called me a lazy boy." (*Id.* at 46:20–4.) Price "really was

2

shocked that [Langston] said that out loud[,]" and Price "shook [his] head and [] walked off" to avoid further harassment. (*Id.* at 47:1–2, 6.). The Supreme Court has held that the use of "boy" alone can be evidence of discrimination, depending on various factors such as "context, inflection, tone of voice, local custom, and historical usage*." Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006). Later that same day, Eric Hawkins, Lead Material Handler, told Price that "what Jamie Langston says goes and that this isn't a democracy, this is a dictatorship." (Price Dep. at 48:1–4.)

Dalan Motz, another of Price's supervisors who was second-in-charge under Frank Harris, (Ex. 3, Motz Dep. at 36:1–16; 64:19–65:1), made a discriminatory remark to Price as well: "[Price] was supposed to receive some T-shirts as an incentive bonus[,] and [Price] stopped Mr. Motz one day to ask him about the shirts and [Motz's] reply was, *you people always want something for free*, and that hurt, you know. He said, you know, what he said, and I didn't particularly feel comfortable with that comment." (Price Dep. at 48:17–23 (emphasis added).) Like the incident with Langston, Price was so shocked by Motz's statement that he "just looked at him and was surprised that he said it out loud." (*Id*. at 49:2–3.) Indeed, "When Mr. Motz replied by saying, 'You people always want something for free,' [Price] knew exactly what Mr. Motz meant, that '*Black* people always want something for free.'" (Price Decl. at ¶ 4.) Price called Valvoline's HR hotline to report instances of discrimination, but nothing ever came of his complaints. (*Id.* at ¶ 6.)

Price also testified that Motz, as the Assistant Plant Manager, would not "be fair all around to everybody," only treating "certain individuals" with respect—and Price was not one of those "certain individuals." (Price Dep. at 59:3–4.) Price "was working in a hostile work environment," which Motz had "a lot to do with" fostering, particularly when Motz was "dealing with [Price]." (*Id.* at 59:13–15.) This often took the form of "[n]itpicking" Price and his work, doing so through "[c]ertain comments, certain things that he would say to other people, just certain ways that he

3

would treat me[,]" all of which Price believes was racially motivated. (*Id.* at 59:18, 21–3; 84:1–8.) On a separate occasion, Price recalls Motz yelling at him "for asking a question about a work order." (*Id.* at 86:19–23.) Price "remember[s] him raising his voice[,]" which is something Price has not witnessed Motz to do any other employee:

> Q: Had you ever heard [Motz] raise his voice to anyone else?
> A: No, sir, I hadn't.
> Q: Did you ever address it with him?
> A: I actually did.
> Q: And what did he say?
> A: Nothing. He just did his little laugh that he does.

(*Id.* at 87:3–10.)

On the publicly available Facebook page bearing his full name, "Dalan Meredith Motz," along with numerous pictures of his face, Motz has made or endorsed numerous race-related, misogynist, or derogatory remarks through posts he has intentionally shared on his publicly available Facebook page. The following posts were made while Motz was employed as a supervisor and working at Valvoline La Porte:

   
   

The first five of these posts were presented to Motz at his deposition, (*See* Motz Dep. at 17:9–29:11.), with the final three pulled from his Facebook account afterward. The text of these posts read as follows:

- "Please don't let the photo get out[,] it could destroy the ideas [sic] of white privilege!" (Sept. 1, 2020 Facebook Post by Motz, Ex. 7.)

- "Why do police get to riots early? To beat the crowd." (Sept. 10, 2020 Facebook Post by Motz, Ex. 8.)

- "So[,] they tear down all the monuments that remind us of slavery[,] [t]hen create a holiday to remember slavery." (June 24, 2021 Facebook Post by Motz, Ex. 9.)

- "'I won't stand while the national anthem is played.' 'That's okay[,] it's not being played for pussies like you." (Sept. 17, 2020 Facebook Post by Motz, Ex. 10.)

- "At least woman's [sic] sports haven't been cancelled[.]" (Aug. 15, 2020 Facebook Post by Motz, Ex. 11.)

- "Lemme [sic] get this straight[:] black people who were never actual slaves, are fighting white people who were never actual Nazis, about removing a statute built by Democrats, because Democrats hate their own history, and it's all Donald Trump's fault?" (June 22, 2020 Facebook Post by Motz, Ex. 12.)

- "The most common words people misuse: Two, To, Too[,] There, Their, They're[,] and Racist." (August 8, 2019 Facebook Post by Motz, Ex. 13.)

- "We went from 'flatting the curve in 14 days' to 'going door-to-door to see your papers[.]' Gotta [sic] admit, I did N-A-Z-I that one coming[.]" (July 11, 2021 Facebook Post by Motz, Ex. 14.)

Motz shared Ex. 8 ("Why do police get to riots early? To beat the crowd.") to his Facebook page after George Floyd's murder in 2020, and it is a clear reference to the protests that took place following his killing. Notwithstanding, Motz deposed:

```
Q:    What riots were going on in 2020?
A:    I don't remember.
Q.    Do you remember George Floyd?
```

5

> A. I remember hearing about George Floyd in the news.
> Q. What do you remember hearing?
> A. His name.
> Q. Anything else?
> A. No.
> Q. Do you know what happened to George Floyd?
> A. I can't recall.

(Motz Dep. at 23:3–14.)

At deposition, Motz was shown a copy of a written statement made by Jeffrey Brown, a former supervisor at the La Porte Warehouse. (*Id.* at 68:12–25; Ex. 6, Brown Statement.) Motz testified that, "from all the information I know there's nothing I disagree with," after he was asked if he disagreed with anything in Brown's statement. (Motz Dep. at 68:19–25.) In this statement, Brown wrote that in the summer of 2020, "[he] was having a conversation with Frank Harris and [Harris] stated we needed more diversity in our workplace. At that time it was majority African American. Frank exclusively does the hiring and has hired more non-African Americans than any other race." (Brown Statement.) Brown continued, writing that on October 29, 2020, Harris expressed his intent to use the attendance policy "to get rid of several people. [Harris] mentioned Craig by name as one he wanted to fire[.] Frank had total discretion as to whom got excused for calling off sick and he was not always fair and consistent." (*Id.*)

In his attached Declaration, Brown averred:

> Regarding Mr. Harris's authority to terminate employees, I recall specifically Mr. Harris expressing to me his intent to enforce the attendance policy for the exact purpose of terminating Mr. Price.

(Ex. 5, Brown Decl. at ¶ 9.) Brown made Price aware of this fact on the day he was terminated. (Price Dep. at 83:12–20.)

When Harris was asked whether he "ever made comments that [he] feels that there should be greater diversity within the workplace at Valvoline La Porte[,]" Harris testified that he wants

6

the warehouse to be "as diverse as the community is, as we are in Houston." (Harris Dep. at 105:3–15.) Harris recognized that the overwhelming majority of employees at Valvoline La Porte were African American. (*Id.* at 107:13–7.) Harris also testified that he has input on who is hired and who is fired. (Harris Dep. at 53:21–3; 58:1–17.) Based on these facts, a reasonable jury could find that Valvoline, through Harris, terminated Price due to his African American race and that Price was subjected to abuse in the workplace because of his race. Importantly, Valvoline ordered but chose not to attach the deposition transcripts of Harris and Motz.

Despite claiming that "[t]he point system is there and it's black and white[,]" Harris confirmed during his deposition he has discretion to assign points, and that it is ultimately his decision "whether or not to give a point[.]" (Ex. 2, Harris Dep. at 80:11–7.) When asked about the morning of October 26, 2020, Harris testified as follows:

> Q: Do you recall the time that Craig Price called in in the morning because he was sick?
> A: If you're talking about the last for his final point, yes, I do.
> Q: You do? Who did he call?
> A: Me.
> Q: And tell us about that conversation.
> A: He said he had gone to a wedding, I can't remember what family member it was, but he had gone to a wedding and he got food poisoning.
> Q: All right. And what did you say to him?
> A. I said, okay, I hope you feel better. I'll see you when you get back.
> Q. Did you tell him he was getting a point?
> A. No, I don't think we discussed about the points at that point. In that discussion I don't think we discussed about the Disciplinary Policy.
> Q: Did you want him to come in even though he had food poisoning?
> A: No.
> Q: Why not?
> A: I wouldn't want anybody to come to work sick.

(*Id.* at 72:15–73:11.)

On the morning of October 26, 2020, Harris intentionally failed to tell Price that he was going to assess him a point during their conversation, the point that Harris would later use to justify

7

Price's termination. Harris also failed to inform Price that he had access to both "72 hours of unused sick time" and "80 sick partial hours" as of October 31, 2020. (Motz Dep. at 83:3–84:13.) Instead of allowing Price to use that unused time, Price was terminated on October 29, 2020. (Ex. 4, Price Decl. at ¶ 7.)

Notably, the attendance policy that Valvoline used to justify Price's termination bears an "Effective date" of "January 21, 2020." (Ex. 15, Ex. To Motz Dep. at 7.) Motz did not know why the attendance policy was changed, only "that the change was implemented at the beginning of a year[.]" (Motz Dep. at 59:8–24.) Likewise, Harris also recognized that the attendance "system changed." (Harris Dep. at 57:15.) Importantly, the attendance policy at issue does not indicate that it applies retroactively—put differently, the attendance policy does not take into account the points an employee accrued *prior* to its "Effective date" of "January 21, 2020[.]"

Again, the attendance policy at issue became effective on January 21, 2020. Most of Price's points, a total of ten occurrences, occurred in 2019. This means that any points Price accrued during 2019 should not have been used against him following the implementation of this new attendance policy; however, Harris, Motz, and Valvoline did exactly that. (*See* Ex. To Motz Dep. at 8–9.) Thus, Price's previously incurred points from 2019 could not and should not have been used against him after the implementation of a new attendance policy for 2020. Indeed, Price only had a total of four points accumulated for the entirety of 2020. (*See* Ex. To Motz Dep. at 18.) Valvoline's decision to terminate Price could not have been motivated by attendance policy violations, because Price needed eight points to be terminated under the new attendance policy, but he only had four. (Ex. To Motz Dep. at 7.) Accordingly, a reasonable jury could find that Valvoline's decision to terminate Price was motivated by Harris's desire to manipulate the racial composition of Valvoline La Porte.

At his deposition, Harris testified that Price "had the availability of vacation time and he had sick time available to him" when Price called in sick with food poisoning. (Harris Dep. at 85:3–13.) However, in an email Harris sent to Robert Shelton and Kevin Meyers on October 27, 2020, (Ex. To Motz Dep. at 18.), Harris wrote the following:

> Jeff put in the below edits into his time. According to Jeff, Craig told him he had vacation time. He did not have vacation time available. Craig told me today he had food poisoning.
> Craig has not presented a doctor's note.
> Craig came to me today asking if he was in any kind of trouble and needs more days off to take care of speeding tickets. If Craig does not mention this, I don't look into it and find out that Craig now has 2 more occurrences. If you take off the 2.5 points from October of last year, he is still at 11.5 occurrences.
> According to the attendance policy, Craig should be terminated today.

Prior to his termination, Price had asked Harris on multiple occasions how many attendance points he had, but each time Harris "would kind of, you know, brush me to the side." (Price Dep. 84:21–85:1.) Price continued: "I remember [Harris] telling me that I was doing okay and that I was doing good and I didn't need to worry about it and him printing out the paperwork would be too much work." (*Id.* at 85:1–4.) Motz testified that an employee must ask to "know how many attendance points he has[,]" and that "there are [no] other way[s] to find out[.]" (Motz Dep. at 63:17–21.) Since his wrongful termination from Valvoline, Price has worked numerous temporary jobs but has had difficulty finding long-term, stable employment like what he had with Valvoline.

II.     LAW AND ARGUMENT.

    A.     ***Hostile Work Environment Based on Race.***

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., prohibits several forms of employment discrimination. The statute has been interpreted to protect an employee's right "to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). As relevant here, Title VII makes it an "unlawful employment practice" for an employer to discriminate "because of such [employee's] race, color,

religion, sex, or national origin" with respect to "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Courts have interpreted this provision to proscribe the creation of a hostile work environment based on an employee's membership in a protected class, such as race or color. *See Meritor*, 477 U.S. at 65.

To prevail on a claim of hostile work environment perpetrated by a supervisor, a plaintiff must prove four elements, the last of which is most relevant here: (1) membership in a protected group; (2) unwelcome harassment; (3) harassment based on the protected characteristic; and (4) harassment affecting a term, condition, or privilege of employment. *Lauderdale* v. *Texas Dep't of Crim. Just., Inst. Div.*, 512 F.3d 157, 162–3 (5th Cir. 2007). "Harassment affects a 'term, condition, or privilege of employment' if it is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hernandez* v. *Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey* v. *Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

Courts consider the totality of the circumstances in deciding whether harassment alters the victim's conditions of employment and creates an abusive work environment. *See, e.g., Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Hernandez*, 670 F.3d at 651. This inquiry "requires careful consideration of the social context in which particular behavior occurs." *Oncale* v. *Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 81–2.

    1.    *The Severity of the Epithets Alone—Spoken by Price's Supervisors in Front of His Coworkers—Demonstrate that Price Suffered from a Hostile Work Environment Based on Race.*

The Supreme Court has explained that a "supervisor's power and authority invests his or her harassing conduct with a particular threatening character[,]" making such harassment more serious. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998). Here, adequate weight must be given to the seriousness of the epithets used and the context in which they were used. Langston, Price's supervisor, yelled at Price that he was a "lazy boy"[2] in the presence of Price's co-workers, who were on the receiving dock nearby. (Price Dep. at 31:2–14; 45:17–47:16; Price Decl. at ¶ 3.)

Those two words have historically been used against African Americans in a discriminatory way. Langston, a Caucasian, used them against Price, his subordinate, because he was not moving fast enough: "the shift had just started and [Price] was trying to get a forklift to work and [Price] wasn't able to[,] and [Langston] started raising his voice, saying—it escalated and, you know, went from there and [Langston] called me a lazy boy." (*Id.* at 46:20–4.) Price "really was shocked that [Langston] said that out loud[,]" and Price "shook [his] head and [] walked off" to avoid further harassment. (*Id.* at 47:1–2, 6.). Indeed, Price "knew what Mr. Langston meant, that I was a 'lazy *Black* boy,' which is why I was shocked he said it out loud. I believe Mr. Langston called me a 'lazy boy' in front of my coworkers to embarrass me." (Price Decl. at ¶ 3 (emphasis in original).)

In *Ash*, 546 U.S. at 456 (2006), the Supreme Court held:

there was evidence that Tyson's plant manager, who made the disputed hiring decisions, had referred on some occasions to each of the petitioners as "boy." Petitioners argued this was evidence of discriminatory animus. The Court of

---

[2] In his autobiography, Frederick Douglass recounted the story of a slaveholder who came across an African American man walking along a road. Douglass observed that the slaveholder "addressed him in the usual manner of speaking to colored people on the public highways of the south: 'Well, boy, whom do you belong to?'" *See* Frederick Douglass, *Narrative of the Life of Frederick Douglass, an American Slave* 61 (1845).

11

Appeals disagreed, holding that "while the use of 'boy' when modified by a racial classification like 'black' or 'white' is evidence of discriminatory intent, the use of 'boy' alone is not evidence of discrimination." Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage. Insofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous.

The social cues of language, such as voice, inflection, and tone, are insights which are difficult to discern from a deposition transcript. This is one reason why racial discrimination cases are inherently fact-dependent and that juries are uniquely positioned to assess their merits. *See Anderson v. Group Hospitalization, Inc.*, 820 F.2d 465 (D.C. Cir. 1987) (affirming district court's decision to deny defendant judgment notwithstanding the verdict on the grounds that jurors were better situated to discern their racial meaning); *see also Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 468 (6th Cir. 2009) (*quoting Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (affirming district court's decision to deny judgment as a matter of law on claim for racially hostile work environment)).

The context and tone, as well as Langston prefacing the word "boy" with "lazy," indicate that he intended to direct both words at Price in a discriminatory manner. *See EEOC v. Jackson National Life Insurance Company*, No. 1:16-CV-02472 (D. Col. Nov. 16, 2022) (finding merit to the EEOC's lawsuit, which settled for over $20M, that African American employees tolerated a racially hostile work environment because they were referred to as "lazy," had stress balls thrown at them, were subjected to racially demeaning cartoons, and a high-level manager referred to multiple African Americans as "resident street walkers").

Regarding the "lazy boy" epithet, Hawkins told Price that "what Jamie Langston says goes and that this isn't a democracy, this is a dictatorship." (Price Dep. at 48:1–4.) Hawkins' statement,

when all reasonable inferences and facts are viewed in the light most favorable to Price, indicates a recognition by Hawkins, an African American, that Langston 'is in charge of you, Price, like a dictator, and if you want work here, you will have to deal with what Langston says to you.'

Courts have repeatedly acknowledged that the word "boy" is racially offensive when directed to an adult black male. *See Alexander v. Opelika City Schools*, 352 F. App'x 390, 393 (11th Cir. 2009); *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008); *Washington v. Kroger Co.*, 218 F. App'x 822, 825 (11th Cir. 2007). Courts have also recognized the use of "boy" as a racial epithet, creating triable jury questions on racial discrimination claims. *See Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 322 (6th Cir. 2010) (finding supervisor's reference to African American men as "boys" supports hostile environment claim); *Betts v. Costo Wholesale Corp.*, 558 F.3d 461, 470 (6th Cir. 2009) (concluding that a white supervisor's reference to African American plaintiff as "Phil's Boy" was "racially loaded" and evidence of racial hostility); *Williams v. Consolidated Edison Corp.*, 255 F. App'x 546, 549 (2d Cir. 2007) (describing "boy" as "racially offensive" and indicative of racial animus); *Baltimore v. City of Franklin*, 2007 U.S. Dist. Lexis 53115, at *42 (M.D. Tenn. July 20, 2007) (holding use of "boy" supports hostile environment claim); *McKenzie v. Citation Corp.*, 2007 WL 1424555, at *12 (S.D. Ala. May 11, 2007) (observing that "using words like 'boy' or 'nigger' to refer to African American employees, is clearly race-related"); *Twymon v. Wells Fargo,* 462 F.3d 925, 934 n.5 (8th Cir. 2006) (observing that certain facially neutral phrases are "materially different from the historically racially disparaging but facially-neutral term 'boy' recently deemed potentially probative of racial animus"); *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 297 (4th Cir. 2004) (reversing summary judgment on hostile environment claim based on defendant's use of "boy," among other racially offensive language).

Indeed, one district court in Tennessee took "judicial notice" that "boy" historically has been used "from the time of slavery" to refer to African American men in a "demeaning, insulting manner." *Bailey v. USF Holland*, No. 3:05-0435, 2007 WL 470439, at *10 (M.D. Tenn. Feb. 8, 2007). Concluding that it was "not credible" that those who had been "born and raised here in the south" would not understand this meaning, the court rejected the testimony of witnesses who professed not to comprehend the word's racially derogatory context. *Id.*

Motz's remark to Price, "*you people always want something for free*", was racist as well—and his Facebook posts corroborate that he made the statement with discriminatory animus.[3] (Price Dep. at 48:17–23 (emphasis added).) Like the incident with Langston, Price was so shocked by Motz's statement that he "just looked at him and was surprised that he said it out loud." (*Id*. at 49:2–3.)

In several racial discrimination cases, courts have been asked to consider the use of "boy" along with "nigger" and other racial epithets to describe African American men. These cases

---

[3]  In *Haydar v. Amazon Corporate, LLC*, No. 2:16-cv-13662, 2018 U.S. Dist. LEXIS 152656, at *54–5 (E.D. Mich. Sep. 7, 2018) (internal citations omitted), the court denied summary judgment, stating:

Amazon claims that "Haydar has no evidence that the supposed comments about 'you people' and leaving his wife behind while he commuted to Seattle were in any way tied to his religion or national origin." But a reasonable jury can make reasonable inferences. Haydar testified as follows, "So Peter [Faricy] made references to you people, to you people need to learn how to treat your wives better, those types of comments repeatedly, you know, in reference to me uniquely differently than other people[.] [S]omehow his view of me was influenced by my inherent characteristics as someone with a name Abdullah coming from a Muslim or an Arab background that I somehow mistreat my wife." From that, a jury could reasonably infer that Faricy's reference to "you people" was a reference to "you [Syrians]" or "you [Muslims]." And because that is a reasonable inference, at this stage of the case, the Court must draw it.

14

indicate that such epithets are often used interchangeably. *See, e.g., Williams v. Consol. Edison Corp. of N.Y.*, 255 F. App'x 546, 549 (2d Cir. 2007) (declining to differentiate between "nigger" and "boy"); *McKenzie v. Citation Corp.*, No. 05-0138-CG-C, 2007 WL 1424555, at *12 (S.D. Ala. May 11, 2007).

The Supreme Court has held that, considering the totality of the circumstances, an isolated incident that is "extremely serious" may constitute a discriminatory alteration of the terms of employment in violation of Title VII. *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 788 (1998). The Fifth Circuit has repeatedly acknowledged that "[u]nder the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim." *EEOC* v. *WC&M Enters.*, 496 F.3d 393, 400 (5th Cir. 2007); *see also Melvin*, 806 F. App'x at 309; *Henry* v. *CorpCar Servs. Houston*, 625 F. App'x 607, 611–2 (5th Cir.); *Mendoza* v. *Helicopter*, 548 F. App'x 127, 129 (5th Cir. 2013); *Lauderdale*, 512 F.3d at 163; *Harvill* v. *Westward Comms, L.L.C.*, 433 F.3d 428, 435-436 (5th Cir. 2005). Recently, the Fifth Circuit held that when a supervisor calls a subordinate "a 'Lazy Monkey A__ N___' in front of his fellow employees—[] an actionable claim of hostile work environment [exists]." *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022).

Numerous other courts of appeals have affirmed the same rule. *See*, *e.g.*, *Castleberry*, 863 F.3d at 264-266; *Boyer-Liberto v. Fontainbleau Corp.*, 786 F.3d 264, 268 (4th Cir. 2015) (en banc) ("[W]e underscore the Supreme Court's pronouncement in Faragher[,] that an isolated incident of harassment, if extremely serious, can create a hostile work environment."); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as [the 'n-word'] by a supervisor in the presence of his

subordinates…[that] impacts the work environment [] severely[.]") (internal quotation omitted); *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1254 (11th Cir. 2014) (finding that although a racially offensive carving on a workplace wall "was an isolated act, it was severe" enough that a "reasonable jury could find that [plaintiff's] work environment was objectively hostile"); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) ("This single incident [of using the 'n-word'] might well have been sufficient to establish a hostile work environment.").

This Court should find that when viewed alone and when viewed together, Langston and Motz's epithets to Price had the severity to establish a hostile work environment based on race.

> 2. *The Totality of the Circumstances Support a Pervasive Hostile Work Environment Because Although Not Expressly Based on Race, Other Conduct was Part of the Same Discriminatory Course of Conduct.*

"[C]ourts consider the totality of the circumstances" in assessing a hostile work environment claim. *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007). The Fifth Circuit has recognized that a single course of discriminatory harassment may include both explicit discriminatory behavior, such as the use of epithets, as well as other harassing behavior that is not explicitly race-based, but nevertheless motivated by racial bias. (*See id*. at 400 (explaining that a reasonable juror could conclude that a colleague who called the plaintiff an "Arab" also was motivated by bias when he banged on the plaintiff's office partition); *see also*, *e.g.*, *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 944 (8th Cir. 2010) ("It is well established that all instances of harassment need not be stamped with signs of overt discrimination if they are part of a course of conduct which is tied to evidence of discriminatory animus.") (citations, alterations, and internal quotation marks omitted).

In *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 402–04 (5th Cir. 2021), for example, the Fifth Circuit recently found that racial epithets, when considered in connection with 'facially neutral' conduct, is sufficient to establish a racially hostile work environment:

> To review, and taking the evidence in the light most favorable to Johnson, Palomares used the term "mayate" on at least two occasions in Johnson's presence. Johnson knew this word translated to "n*****." Palomares also regularly used the racist epithets "pinchis mayates" and "pinchis negros." He assigned Johnson less favorable work tasks and referred to Johnson—and Johnson only—as "manos" and "mijo," terms that could reasonably be interpreted as racially pejorative depending on context-specific factors. In addition, Palomares twice hid paperwork that Johnson submitted in his effort to receive a promotion. Johnson also endured harassment perpetrated by another co-employee who once called him "n*****" to his face. And the harassment Johnson suffered arguably interfered with his ability to work at PRIDE. Under the totality of the circumstances, a reasonable factfinder could conclude that the harassment Johnson allegedly experienced at PRIDE was severe or pervasive enough to constitute a hostile work environment.

Like the plaintiff in *PRIDE*, Price was subjected to numerous 'facially neutral' adverse actions in the workplace in addition to having numerous racial epithets said to him, such as: (1) Harris retroactively applying the attendance policy to Price; (2) Harris refusing to tell Price how many attendance points Price had; and (3) Harris hiding from Price his intention to terminate Price after Price called in sick on October 26, 2020, which was part of Harris's plan of achieving more 'diversity' in the workplace. In sum, numerous courts have acknowledged that the racist epithets used in this case, when taken in conjunction with 'facially neutral' adverse actions, establish a hostile work environment. This Court should likewise find that, based on the totality of the evidence presented in the Statement of Material Facts, (Section I, *supra*.), Price was indeed working in a racially hostile environment.

**B.    WRONGFUL TERMINATION BASED ON RACE.**

An employee may prove race discrimination based on direct or circumstantial evidence. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001) (citing *Urbano v. Cont'l*

*Airlines, Inc.*, 138 F.3d 204, 206 (5th Cir. 1999)). "Direct evidence is evidence that requires the conclusion, without any inference, that unlawful discrimination was at least a motivating factor in an employer's actions." *Douglas v. Eaton Corp.*, 577 F. App'x 520, 523, n.1 (6th Cir. 2014) (internal citation omitted). Should the plaintiff prevail on direct evidence, the matter proceeds directly to trial—summary judgment is *never* appropriate where the plaintiff has established, through the totality of the evidence, that his employer was more likely than not motivated by discriminatory intent. Otherwise, the plaintiff's circumstantial evidence is subjected to the tripartite *McDonnell-Douglas* analysis.

On October 29, 2020, the same day Price was terminated, (Price Decl. ¶ 6.), Harris expressed his intent to use the attendance policy to achieve more 'diversity' in the predominantly African American workplace. (Brown Decl. at ¶ 8; Brown Statement, Ex. 6.) According to Section 703 of Title VII, which makes it "an unlawful employment practice for an employer [] to discharge any individual [] because of such individual's race[,]" or "to limit [] his employees" based on race, Harris has violated to plain language of Title VII. *See Equal Emp. Opportunity Comm'n v. Ryan's Pointe Houston, L.L.C.*, No. 19-20656, 2022 WL 4494148, at *4 (5th Cir. Sept. 27, 2022) (reversing summary judgment on discrimination claim where direct evidence showed a supervisor's desire to "'change the demographic[s]' of the staff[,]" which was predominantly Mexican, was a statement made "proximate in time to the adverse employment action, namely [] termination").

According to the United States Census Bureau, La Porte has a total estimated population of 35,340. (2020 ACS 5-Year Demographic and Housing Estimates.) This number fluctuates, depending on the survey referenced, from 35,124 residents (2020 Decennial Census Redistricting Data) to 35,957 residents (2021 ACS 1-Year Race Supplemental Estimate.) However, regardless

of survey used, one statistic remains consistent: La Porte has approximately 20,000 Caucasian residents, and approximately less than 3,000 African American residents. (Id.) And as for Houston, with a population estimate of 2.3 million, the largest demographic is Hispanic at approximately 1 million residents, with Caucasian and African American residents roughly equal at an estimate of 500,000 each. (2020 Decennial Census Redistricting Data).

So, if Harris intends to make Valvoline La Porte "as diverse as the community is," the only way to make that happen would be reduce the number of African American employees and increase the number of Caucasian employees. Terminating Price was a step in this direction.

### III. CONCLUSION.

Based on the foregoing, the Court must deny Valvoline, LLC's Motion for Summary Judgment in its entirety, and allow Price's claims to be heard by a jury of his peers.

Respectfully submitted,

/s/ Lewis A. Zipkin

Lewis A. Zipkin, Esq. (Ohio Bar No. 0030688)
Kevin M. Gross, Esq. (Ohio Bar No. 0097343)
ZIPKIN WHITING CO., L.P.A.
3637 Green Road
Beachwood, Ohio 44122
Phone: (216) 514-6400
Fax: (216) 514-6404
Email: lawsmatter2@gmail.com
kgross.zipkinwhiting@gmail.com

*Pro Hac Vice Counsel for Plaintiff Craig Price, II*

Melissa B. Carr, Esq. (Texas Bar No. 24065008)
S.D. Tex. Federal ID No. 3667785
DUBOIS, BRYANT & CAMPBELL, LLP
303 Colorado Street, Suite 2300
Austin, Texas 78701
Phone: (512) 457-8000
Fax: (512) 457-8008
Email: mcarr@dbcllp.com

*Texas Counsel for Plaintiff Craig Price, II*

## **CERTIFICATE OF SERVICE**

A true and correct copy of the Plaintiff's Brief in Opposition to the Defendant's Motion for Summary Judgment was served via the Court's CM/ECF system on December 5, 2022, upon:

Jeremy W. Hawpe, Esq.
LITTLER MENDELSON, P.C.
2001 Ross Avenue, Suite 1500
Lock Box 116
Dallas, Texas 75201
Phone: (214) 880-8100
Fax: (214) 880-0181
Email: jhawpe@littler.com

*Counsel for Defendant Valvoline, LLC*

Respectfully submitted,

/s/ Lewis A. Zipkin
Lewis A. Zipkin, Esq. (Ohio Bar No. 0030688)
Kevin M. Gross, Esq. (Ohio Bar No. 0097343)

*Pro Hac Vice Counsel for Plaintiff Craig Price, II*

Melissa B. Carr, Esq. (Texas Bar No. 24065008)
S.D. Tex. Federal ID No. 3667785

*Texas Counsel for Plaintiff Craig Price, II*